**E-FILED**
Tuesday, 24 July, 2012  03:23:29 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| **MICHELLE KNIGHT AND JEFFERY BARTH,** )<br>)<br>**Plaintiffs,** )<br>)<br>)<br>**ENBRIDGE PIPELINES (FSP), LLC and** )<br>**CCPS TRANSPORTATION, LLC ,** )<br>)<br>**Defendants.** )<br>) | **No. _____** |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Pursuant to FRCP 57, the Plaintiffs, Michelle Knight and Jeffery Barth complain against the Defendants Enbridge Pipelines (FSP), LLC and CCPS Transportation, LLC, as follows:

**JURISDICTION**

1.      Plaintiff Michelle Knight is an individual who resides at 5324 Kettle View Court, Slinger, Wisconsin 53086.

2.      Jeffery Barth is an individual who resides at 6484 East 1600 North Road, Flanagan, Illinois 61740.

3.      The Defendant CCPS Transportation, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of Texas.  Its sole member is Enbridge Energy, Inc., a Delaware corporation with its principal place of business in the State of Texas.

4.      The Defendant Enbridge Pipelines (FSP), LLC is a limited liability company organized under the laws of the State of Delaware with a principal place of business in the State of Texas.  Its sole member is CCPS Transportation, LLC, the other defendant.

1

5.     The amount in controversy exceeds the sum of $75,000.000, exclusive of interests and costs.

6.     This court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

## COUNT I

7.     Plaintiffs are siblings who together own an undivided interest in fee simple in a 40-acre farm described as the Southeast ¼ of the Northwest ¼ of Section 29, Township 28 North, Range 4 East of the Third Principal Meridian, Livingston County, Illinois.

8.     Plaintiffs are also successors in the ownership and operation of a family farm, which was established in 1944, where now the 4th generation of the family is actively working.

9.     The farm is a part of a larger family farm which is located generally on nearby-farmland, owned by Plaintiffs' parents, an aunt, and long-term landlords who comprise an "extended family" and consider themselves an integral part of the family farm operation.

10.    In 1952, the Plaintiffs' predecessor in title conveyed to the Sinclair Pipe Line Company a blanket easement for the sum of $68.00, a copy of which is attached hereto as Exhibit A, for a single underground pipeline, later known as the Spearhead Pipeline, for the transportation of liquids or gases [energy products], in perpetuity, by the following grant contained in Exhibit A:

FOR AND IN CONSIDERATION OF THE SUM OF Sixty-eight and no/100------------------- DOLLARS,

to the grantors paid, the receipt of which is hereby acknowledged, JAMES H. FERITER, a bachelor

herein called Grantors, hereby grant unto SINCLAIR PIPE LINE COMPANY, a Delaware corporation, hereafter called Grantee, its successors and assigns, the right to lay, maintain, inspect, operate, protect, repair, replace and remove a pipe line for the transportation of liquids and/or gases on, over and through the following described land of which grantors warrant they are the owners in fee simple, situated in   Livingston   County, State of   Illinois   to-wit:

Southeast quarter of the Northwest quarter (SE/4 NW/4) of Section 29, Township 28 North,

Range 4 East,

11.     The Spearhead Pipeline is a 22-inch underground pipeline which after many owners is now owned by the Defendant, CCPS Transportation, LLC.

12.     Both Defendants are members of a controlled group of interrelated companies in a complex corporate structure wholly owned and/or controlled by Enbridge, Inc., a Canadian corporation, [herein Enbridge] which is headquartered in Calgary, Alberta and was originally chartered many decades ago by the Board of Directors of the Imperial Oil Company, one of the many original Rockefeller oil companies.

13.     The control center regulating the daily flow of product and pressure through the Enbridge Canadian and US pipeline system is located in Edmonton, Alberta.

14.     For its first 56 years in operation, the Spearhead Pipeline primarily delivered conventional crude oil from Cushing, Oklahoma to the BP refinery at Whiting, Indiana and the other two major crude oil refineries in the greater Chicago area.

15.     The conventional crude oil benchmark, West Texas Intermediate Crude [also known as Texas light sweet crude] has a low sulfur content and low viscosity [moves easily through a pipeline].

16.     Conventional crude oil is also transported at the normal temperature of the subsoil which contains the pipeline.

17.     More recently, after the flow of the Spearhead Pipeline was reversed and a 42-inch pipeline was constructed by Enbridge from Edmonton, Alberta to Pontiac, Illinois, a manufactured energy product which is considered fungible with crude oil, known as dilbit, became an additional product delivered by the Spearhead Pipeline to Cushing, Oklahoma from the storage tank farm of Enbridge located at Pontiac, Illinois.

18.     The energy ingredient of dilbit is bitumen, which is not naturally in a liquid form but is blended with a diluent so it will flow in a pipeline something like a liquid.

19.     Diluent is generally an end-product of crude oil refining, is a highly flammable liquid, and in laymen's terms may be described as being like a paint thinner.

20.     Dilbit often has a sulfur content or sulfur gas associated with it, like other energy sources heavier than conventional crude oil.

21.     Dilbit is much thicker than conventional crude oil and has a high viscosity in comparison.

22.     Dilbit is also delivered by pipeline transportation at a temperature range of 100-150 degrees Fahrenheit in order to decrease its viscosity.

23.     The 30-foot width of the Exhibit A easement was established by use by the Amoco Oil Company prior to being acquired by the Defendant, CCPS Transportation, LLC.

24.     When the Exhibit A easement was made, the parties making it did not contemplate the construction of additional pipelines.

25.     When the Exhibit A easement was made, neither did the parties making it contemplate the unsafe conditions created for a farm, which would contain in its subsoil a large diameter, high pressure pipeline operating at a temperature range of 100-150 degrees Fahrenheit, characteristics which were generally unheard of in 1952.

26.     The high pressure, high temperature pipeline carrying a hazardous material has been recently introduced into the USA by the Canadian owned pipeline companies.

27.     The following provision of the Exhibit A easement further establishes that a large diameter, high pressure pipeline operating at 100-150 degrees Fahrenheit was not contemplated in 1952:

4

> The one additional pipe line which grantor hereinbefore gives and grants unto the ~~grantee the right of way~~ to construct and operate shall be laid parallel with the first or original pipe line and at no place more than 10 feet from said original pipe line.

28.     When the Exhibit A easement was made, neither did the parties making it contemplate the easement being used to deliver dilbit, often accompanied by a highly flammable and lethal sulfur-based gas, which during any pipeline leak could cause immediate human harm if the sulfur-based lethal gas is inhaled or the dilbit is ignited.

29.     The ignition of the dilbit could cause a catastrophic explosion in a several hundred-foot radius around the pipeline, creating a crater on the surface of the land and vaporizing human life and homes or other farm buildings within the radius.

30.     In late December 2011, the Defendant, Enbridge Pipelines (FSP), LLC, announced its decision to construct a 36-inch high pressure pipeline from Pontiac, Illinois to Cushing, Oklahoma along the existing route of the Spearhead Pipeline, to be called the Flanagan South Pipeline.

31.     The Flanagan South Pipeline project is estimated to cost 2.8 billion dollars and upon completion will deliver along a 600-mile plus route a daily load of up to one million barrels of dilbit, or other crude petroleum products, to Enbridge's massive crude oil hub in Cushing, Oklahoma.

32.     From Cushing, the route continues another 500 miles to the United States Gulf Coast city of Port Arthur, Texas, in a large, high-pressure pipeline which Enbridge acquired in the latter part of 2011, and then after reversing its flow, further increased the pressure in this pipe for use in delivering liquid unrefined energy products to the Gulf of Mexico.

33.     There is presently a glut of crude petroleum in the Midwestern USA due to the increased supply of dilbit from Northern Alberta, Canada and the increased production of conventional crude oil from the Williston Basin [North Dakota], both sources being transported by substantial existing pipeline infrastructures to Pontiac, Illinois.

34.     The Flanagan South Pipeline will help relieve the Midwest glut of crude petroleum by making it available for export, or in the alternative, making it available for refining and the subsequent export of refined petroleum.

35.     Reaching the Gulf Coast area creates flexibility for the dilbit to be delivered to any of the 30 crude oil refineries in the Greater Gulf Coast area, and also for export by ocean tanker to distant countries like China.

36.     The USA is currently a net exporter of refined petroleum.

37.     The Gulf Coast area has long been a highly valued destination of Enbridge because the dilbit has a greater market value there than in Canada when including the transportation cost, which creates an additional value known as "netback."

38.     Netback often has a range of $10.00-$45.00 per barrel, which will increase the sales price to the Canadian sellers of dilbit by as much as $800,000.00 to $3,000,000.00 per day when the Flanagan South Pipeline is functional.

39.      The  effect of netback is an increase in value of the sand tar deposits in Northern Alberta, Canada by trillions of dollars, but creates little, if any, reduction in the domestic price of gasoline at the retail level in the USA.

40.     The key provisions of the Exhibit A easement being relied on by the Defendant, Enbridge Pipelines (FSP), LLC, for a right to construct a second pipeline include the following:

As a part of the consideration hereinabove set forth Grantors hereby grant unto said Grantee the right at any time or times to construct and operate an additional pipe line or pipe lines alongside of said first pipe line on, over and through said land, and

one

said

Grantee agrees to pay Grantors for each additional pipe line so placed the sum of _Sixty-eight & no/100------_ Dollars, on or before the time Grantee commences to construct such pipe line on the land hereinabove described. Said additional line to be subject to the same rights, privileges and conditions as the original line.

Grantee shall have the right to change the size of its pipes, the damages, if any, in making such change to be paid by the said grantee.

•  •  •  •

The rights herein granted may be assigned in whole or in part.

The terms, conditions and provisions hereof shall extend to and be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the parties hereto.

41.     Although the manner in which the purported right to construct a second pipeline will be transferred from the Defendant, CCPS Transportation, LLC, to the Defendant, Enbridge Pipelines (FSP), LLC, has yet to be announced or disclosed, the Exhibit A easement may be assigned in whole or in part.

42.     The Plaintiffs' farm will have three active pipelines owned by three different Enbridge entities, creating a much higher safety risk to the Plaintiffs, their family members, and their landlords when the Flanagan South Pipeline and the recently announced Southern Access Extension Pipeline [another Enbridge project explained *infra*] are completed.

43.     The farms operated by Plaintiffs have two modern, well-maintained homes and other farm improvements which are fully functional and productive, creating constant, normal human existence within an ultra-hazardous danger zone which the Flanagan South Pipeline would create.

44.     The Defendant, Enbridge Pipelines (FSP), LLC, has proceeded with its plans to construct the Flanagan South Pipeline, including the filing of multiple applications to several units of government located in the USA and holding a successful "open season" for Canadian shippers to measure the demand for the use of the proposed pipeline.

45.     The Defendant, Enbridge Pipelines (FSP), LLC, has also been communicating with Plaintiffs, not through its employees, but rather through a sales force, provided by a right-of-way acquisition company, which has contracted with Enbridge to provide a temporary team of experienced salespeople for acquiring farm owner consents pertaining to construction of the second pipeline.

46.     One of the many applications made by the Defendant, Enbridge Pipelines (FSP), LLC, was to the Illinois Commerce Commission for the purpose of obtaining eminent domain, so that it can secure a continuous right-of-way for the entire route from Pontiac, Illinois to the Mississippi River.

47.     According to the Defendant, Enbridge Pipelines (FSP), LLC, in its Application being considered by the Illinois Commerce Commission, the power of eminent domain will be invoked when the Defendant considers it necessary.

48.      If granted, the power of eminent domain will be used to either create new easements or expand the existing pipeline easement in instances where the Defendant, Enbridge Pipelines (FSP), LLC, determines there are reluctant farm owners it has referred to as "holdouts" in its Application.

49.     A part of the Defendant Enbridge Pipelines (FSP), LLC's Flanagan South Pipeline Application with the Illinois Commerce Commission is a proposed easement it will be seeking through either the threat or exercise of eminent domain, a true and correct copy of Defendant's proposed easement being attached hereto as Exhibit B.

50.     The proposed Exhibit B easement is substantially more comprehensive and restrictive than the Exhibit A easement because the Exhibit B easement includes, among other

things, the right to remove existing man-made structures, such as homes or farm buildings, which exist in the proposed new right-of-way.

51.    The Defendant, Enbridge Pipelines (FSP), LLC, need not now rely on the provision of the Exhibit A easement purporting to create a right to construct a second pipeline, since it will be able to expand its pipeline corridor using eminent domain.

52.    In addition to the Flanagan South Pipeline, the Defendant, Enbridge Pipelines (FSP), LLC, desires to construct in the future at least one additional pipeline through the farm of the Plaintiffs according to the July 9, 2012 letter from Enbridge, a true and correct copy being attached hereto as Exhibit C.

53.    The proposed route of the Southern Access Extension passes through Plaintiffs' farm parallel to the Spearhead Pipeline.

54.    The Southern Access Extension Project was the subject matter of Enbridge's 2007 Application to the Illinois Commerce Commission [07-0446], which proposed a 36-inch high-pressure pipeline to be located parallel to the Spearhead Pipeline for several miles southwest of Pontiac, Illinois, crossing Plaintiffs' farm, before turning southerly toward Patoka, Illinois.

55.    Enbridge's 2007 Application to the Illinois Commerce Commission [07-0446] was supported by the testimony of two highly ranked officers of Enbridge who said that the Spearhead easement would not be relied on for creating a new right-of-way parallel to the Spearhead Pipeline because the Spearhead Pipeline was owned by a separate, freestanding entity.

56.    The Exhibit A easement was made without the threat of eminent domain.

57.    The Exhibit B easement describes the width of the newly proposed perpetual easement for the Flanagan South Pipeline Project to be 50 feet.

58.     The Exhibit B easement incorrectly suggests that the width of the Exhibit A easement is 50 feet.

59.     A true and correct copy of the proposed easement for the Southern Access Extension Pipeline is attached hereto as Exhibit D.  The Exhibit D easement does not rely on any rights created by the Exhibit A easement.

60.     The Southern Access Extension Pipeline will transport dilbit with the identical safety concerns which surround the Flanagan South Pipeline.

61.     The purported existence of the perpetual right to construct an additional pipeline is void based on Illinois law in 1952, which prohibited perpetual options to acquire an interest in real estate and further prohibited perpetual preemptory rights in real estate which would create an unreasonable restraint on alienation.

62.     After a lapse of 60 years, the Exhibit A easement, unlike a taking under the threat of eminent domain, no longer provides for just compensation or what would today be considered reasonably adequate consideration, to be paid to Plaintiffs, for the right to construct an additional pipeline and the perpetual use of Plaintiffs' farm.

63.     An actual controversy now exists between Plaintiffs and Defendants regarding whether the provisions of the Exhibit A easement, which purports to create a perpetual right to construct the additional pipeline at issue, is void under Illinois law, and whether the grant created by the Exhibit A easement is limited to a 30-foot width.

64.     Plaintiffs' therefore seek a declaration of their rights pursuant to 28 U.S.C. § 2201.

Wherefore, the Plaintiffs pray for the Court to make a declaratory finding which is consistent with the following:

A. The provision in the Exhibit A easement creating a right to construct a second pipeline is void since it violates the Rule Against Perpetuities and creates an unreasonable Restraint on Alienation due to its purported perpetual existence;

B. The unsafe conditions of Flanagan South Pipeline were not contemplated at the time the 1952 easement was made; therefore, the construction of the Flanagan South Pipeline is not authorized by the Exhibit A easement;

C. The width of the Exhibit A easement created by use is 30 feet and cannot be expanded under any provision contained in the Exhibit A easement; and

D. Such further relief as the Court finds just in the premises.

Respectfully submitted,

Michelle Knight and Jeffery Barth,
Plaintiffs

By: _____

Mercer Turner, their attorney

Mercer Turner
Law Office of Mercer Turner, P.C.
202 North Prospect Road
Bloomington, IL 61740
(309) 662-3078

Date: July 24, 2012