E-FILED
Thursday, 22 August, 2013  01:31:19 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| MICHELLE KNIGHT and JEFFERY BARTH, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ENBRIDGE PIPELINES (FSP) L.L.C. and CCPS TRANSPORTATION, L.L.C., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ———————————————————— ) | Case No. 12-CV-01244 |
| | ) |
| ENBRIDGE PIPELINES (FSP) L.L.C. and CCPS TRANSPORTATION, L.L.C., | ) |
| | ) |
| Counterclaimants, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHELLE KNIGHT and JEFFERY BARTH, | ) |
| | ) |
| Counterdefendants. | ) |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 7.1 (D)(2)

Now come the Plaintiffs, Michelle Knight and Jeffery Barth, by their undersigned attorney, and hereby submit their Response to the Defendants' Motion for Summary Judgment.

I.     Introduction

The Defendants' Motion for Summary Judgment is defective for the following reasons and therefore should be denied:

A.     Plaintiffs have not raised a federal law question,

B.      Plaintiffs' case is not based on The Pipeline Safety Improvement Act of 2002,

C.      Plaintiffs' case is not preempted,

D.      There are material issues of unresolved fact which would make a summary judgment decision premature at this time, but perhaps after discovery, a summary judgment motion would be ripe, for either party,

E.      The issue involving the Flanagan South Pipeline, the proposal which instigated the lawsuit, is now under construction on the Plaintiffs' farm, so with respect to that pipeline, the case is moot.

II.     Undisputed Material Facts

Paragraphs 1-4 and 7-9 are conceded.  Paragraphs 5-6 are conceded except that the excerpts referred to in Paragraphs 5-6 must be read in conjunction with other provisions of the easement at issue. Paragraph 10 is conceded except the construction has proceeded under a plan approved by the Illinois Commerce Commission, which is inconsistent with the 1952 easement at issue.

III.    Disputed Material Facts

Paragraphs 5-6 are conceded except that the excerpts referred to in Paragraphs 5-6 must be read in conjunction with other provisions of the easement at issue. The evidentiary documentation is the easement at issue.

Paragraph 10 is conceded except the construction has proceeded under a plan approved by the Illinois Commerce Commission, which is inconsistent with the 1952 easement at issue.  The evidentiary documentation is the easement at issue and the actual field plans which are presently being drawn, which are also not now available now.  In general, the

2

construction has the Flanagan South pipeline 50-feet from the 1952 pipeline, instead of 10-feet.

IV.    Disputed Immaterial Facts

There are none.

V.     Undisputed Immaterial Facts

There are none.

VI.    Additional Material Facts

Plaintiffs are condemnation defendants in a case filed in Livingston County, Illinois, a true and correct copy of which is attached hereto as Exhibit A.

VII.   Argument

The theory of Defendants' Motion for Summary Judgment is either (1) that the Plaintiffs' case is based on the Pipeline Safety Improvement Act of 2002, or (2) that Plaintiffs are pursuing a private cause of action implicit in the Pipeline Safety Improvement Act of 2002.  However, neither assertion is accurate.   Plaintiffs are not and have not made any claim under any Federal statute or regulation.  The instant case does not raise a federal question.

Defendants make these assertions to wrongfully narrow the scope of the case, and thereby incorrectly assert that this Court has no authority to consider Federal hazardous material pipeline regulations.  On this topic, a farm owner is not given the right to prosecute the Defendants for the times when they have violated Federal pipeline regulations.  However, the failure of the Defendants to comply with Federal pipeline regulations would be a valid factual consideration in the event of a private action by a landowner after a pipeline failure. *Stutler v. Marathon Pipeline Co*., 998 F.Supp. 968 (S.D. Ind., 1998).  Plaintiffs will not address further the preemption defense in the instant case, because the Pipeline Safety

3

Improvement Act of 2002 is not an issue in this case.    To be clear, the Defendants' approach is inexact.  The Pipeline Safety Improvement Act of 2002 is not mentioned either directly or indirectly in the Complaint, or in any material filed by the Plaintiffs with respect to the reciprocal Motions for Judgment on the Pleadings.  Neither can the Defendants identify a single reference in the 1952 easement at issue to any Federal statute or regulation.

Plaintiffs had instead justifiably raised the issue of whether the Defendants are exceeding the scope of the 1952 easement by creating an unsafe industrial corridor which is inconsistent with farming and not contemplated in 1952 when the easement was executed.  "If the easement is limited in scope or purpose, the owner of the property subject to the burden is entitled to prevent such burden from being increased."  *Marlatt v. Peoria Water Works Co*. (1969), 114 Ill.App.2d 11, 14, 252 N.E.2d 403, See also *Dickman v. Madison County Light & Power Co*. (1922), 304 Ill. 470, 482, 136 N.E. 790." *Consolidated Cable Utilities, Inc. v. City of Aurora*, 108 Ill.App.3d 1035, 439 N.E.2d 1272 (2nd Dist. 1982).  Another Illinois Appellate Court stated it this way:

> "[N]o precise rule can be stated as to when the use by the owner of the servient or dominant estate was a reasonable use as distinguished from an unreasonable use, **it is a question of fact to be determined from the facts and conditions prevailing.**" McMahon, 298 Ill.App.3d at 240. 232 Ill.Dec. 269, 697 N.E.2d 1199. Where the extent of an easement is exceeded or misused, the dominant owner becomes a trespasser (R. Ward, Extent of Easement Over Servient Estate, 33 POF.2d at 681) and liable for damages resulting from the improper use (28A C.J.S. Easements § 169, at 387). *Duresa v. Commonwealth Edison Co.*, 348 Ill.App.3d 90 (1st Dist. 2004).  [Emphasis by Plaintiffs]

The instant case is a contract and real property state law claim.  The Pipeline Safety Improvement Act of 2002 creates no defense to Plaintiffs' State law case and cannot be used to expand the scope of an easement created 50 years before it was enacted.  Therefore,

because of insufficient legal reasoning, the Defendants' Motion for Summary Judgment should fail.

There are two unambiguous provisions of the 1952 easement which establish its scope then intended, when it was signed over 60 years ago. First, the surface of the land above the pipeline easement would be farmed. Second, the expansion must be within 10- feet of the existing pipeline built in 1952.

Farming the surface of where the easement exists has occurred continuously since 1952, and will occur perhaps for several more centuries. The land, which is the subject matter of the easement at issue, is a part of the most significant land base of highly productive farmland in the world. There is no reason for anyone in 1952, or in 2013, to contemplate that this land would become an industrial area, where ultra-risky hazards exist around the clock on a continuous basis. Having two new 36-inch high pressure pipelines, which will transport hazardous materials will transform the safe, peaceful setting where the farm at issue is located into one where there will be major safety risk for the land and the individuals who farm the land. This was not contemplated in 1952, and it would be unreasonable for anyone to conclude otherwise when the consideration was $60.

The language of the 1952 easement also limits the type of activity which may be conducted by the easement owner by limiting the construction of any new pipeline to within 10-feet of the original pipeline constructed in 1952. Since the time this case was initially filed, the Defendants' affiliate has re-opened the 2007 proceedings before the Illinois Commerce Commission to request a reversal of the 2008 decision to deny the power of eminent domain. The first ICC hearing is scheduled on August 22, 2013 in that proceeding. (http://www.icc.illinois.gov/docket/files.aspx?no=13-0446&docId=200877). No one would

5

have or could have contemplated in 1952 that any pipeline company would construct high pressure pipelines which pose the risk of these newly proposed pipelines. The mere crowding of the multiple pipelines, if constructed under the 1952 easement, creates an ultra-hazardous risk, which is inconsistent with farm operations. No reasonable person would expect at anytime, whether in 1952 or present, that a farm owner would contemplate the risk of death, property damages, or unsolvable contamination well beyond the 10-foot limits required by the easement at issue.

A pipeline disaster could create instant death, property damage, and unsolvable environment damage. Defendants and its affiliates have experienced this. The USA government sanctioned Defendants' affiliate after two employees who were sent to repair a minor pipeline leak in 2008 in Minnesota, instantly perished due to inadequate precaution. Please see Exhibit B hereto. Another affiliate of Defendants has admitted to spending hundreds of millions of dollars in remediation after a 2010 pipeline disaster near Marshall, Michigan, where Enbridge employees ignored its SCATA pressure sensing system alarms for nearly 18 hours before investigating whether a leak occurred. Please see Exhibit C hereto. The risk of Defendants' proposal goes well beyond any Federal Regulations. Human failure in the operation of the pipeline creates additional risk. Therefore, multiple factual issues exist which would bar a summary judgment decision at this time.

The activities of the Defendants since the instant case was filed, now make the Defendants' motion moot. The express language of the easement at issue only authorizes the construction of one additional pipeline. As the court is aware by virtue of the pending issues raised in the complaints seeking enforcement of the 1952 easement with respect to other properties, the Defendants now have the power of eminent domain with respect to the

Flanagan South Project and are now constructing of one of the two newly proposed pipelines. Defendants asserted in open court on August 21, 2013 that the newly filed complaints should be consolidated with the instant case.  Furthermore, the Defendants' affiliate is now pursuing its quest for eminent domain for a third pipeline which will cross Plaintiffs' farm.

No issue remains in the instant case whether the Plaintiffs will have the legal authority to construct the Flanagan South pipeline, which was the subject of Plaintiffs' complaint, because Defendants are exercising the power of eminent domain, not rely on 1952 easement, and are now indeed constructing the Flanagan South pipeline across the farm at issue in the instant case.

A second decision by the Illinois Commerce Commission to give eminent domain power to Defendants' affiliate will allow the construction of a 3rd pipeline on the premises at issue, even though the easement at issue only authorizes one new pipeline.  Therefore, the motion for the summary judgment is moot since it does not raise any legal issue which is real. *Myre by Myre v. Board of Educ. of Seneca Tp. High School Dist. No. 160*, 439 N.E.2d 74, 108 Ill.App.3d 440 (3rd Dist. 1982).

Wherefore, the Plaintiffs pray that the Defendants' Summary Judgment Motion be denied.

Respectfully submitted,

MICHELLE KNIGHT AND JEFFERY BARTH
Defendants

By: ___/s/ Mercer Turner___
Mercer Turner, their attorney

Mercer Turner
Law Office of Mercer Turner, P.C.
202 North Prospect Road, Suite 202
Bloomington, IL 61704
(309) 622-3078

STATE OF ILLINOIS    )
                       ) SS.
COUNTY OF LIVINGSTON  )

# Exhibit A

### IN THE ILLINOIS CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT, LIVINGSTON COUNTY, ILLINOIS

| | |
|---|---|
| ENBRIDGE PIPELINES (FSP) L.L.C., ) | Case No. 13·ED·8 |
| Plaintiff, ) | |
| v. ) | JURY TRIAL DEMANDED |
| MICHELLE E. KNIGHT and JEFFREY ) E. BARTH, and UNKNOWN OWNERS, ) | |
| Defendants. ) | |

**COMPLAINT FOR CONDEMNATION
OF PERMANENT AND TEMPORARY EASEMENTS
FOR INTERSTATE
COMMON CARRIER PIPELINE**

Plaintiff ENBRIDGE PIPELINES (FSP) L.L.C. (hereinafter referred to as "Enbridge" or "Plaintiff"), by and through its attorneys, Sidley Austin LLP and Westervelt, Johnson, Nicoll & Keller, LLC, makes this complaint for condemnation and respectfully represents to the Court as follows:

1.    Plaintiff Enbridge is a Delaware limited liability company with its principal office located at 1100 Louisiana Street, Houston, Texas 77002. Plaintiff is authorized to conduct business in the State of Illinois and is engaged in the business of owning and operating an interstate common carrier pipeline system that will transport crude petroleum and other petroleum liquids to markets in the United States. Enbridge is a common-carrier-by-pipeline within the meaning of the "Public Utilities Act/The Common Carrier by Pipeline Law"

(220 ILCS 5/1-101 et seq. / 220 ILCS 5/15-401 et seq.).  As a common-carrier-by-pipeline, Plaintiff is subject to the jurisdiction of the Illinois Commerce Commission (the "Commission").

      2.     On February 14, 2013, after hearing an application filed by Enbridge bearing Docket No. 12-0347 and entitled "Application pursuant to Sections 8-503, 8-509, and 15-401 of the Public Utilities Act/the Common Carrier by Pipeline Law for Certification and Authority to Construct and Operate a Petroleum Pipeline and When Necessary to Take Private Property as Provided by the Law of Eminent Domain," the Commission entered an "ORDER" authorizing and issuing a "Certificate In Good Standing" to Enbridge directing it to construct, operate, and maintain an interstate pipeline -- the "Flanagan South Pipeline" -- for the transportation of crude petroleum and petroleum liquids along a pipeline route, or right-of-way, as specified in the Commission's Order, and to place such pipeline in service by the middle of 2014.  The Flanagan South Pipeline, which will be 36-inches in outside diameter, will be located in approximately 168 miles of pipeline right-of-way in Illinois extending from a terminal facility (the "Flanagan Terminal") owned by an Enbridge affiliate near Pontiac, Illinois in a generally southwesterly direction through parts of Livingston, Woodford, Tazewell, Mason, Fulton, Schuyler, Brown, and Adams Counties to the Illinois/Missouri border near Quincy, Illinois.  A true and correct copy of the Commission's ORDER of February 14, 2013, as entered and issued that day, together with Attachment A thereto specifying the pipeline's route by section, township, range, and county, is attached hereto marked as "Exhibit A," and is hereby made a part of this complaint.

      3.     In its February 14, 2013 ORDER authorizing and directing the construction of the Flanagan South Pipeline, the Commission ordered that Enbridge construct, operate, and maintain the pipeline generally along the route specified in Attachment A to its

ORDER within fifty (50)-foot wide permanent right-of-way easements and utilize temporary workspace easements alongside such right-of-way during construction of the line generally eighty-five (85) feet in width. Additional workspace easement area was authorized for some locations, such as river and road undercrossings, where special construction requirements or techniques require greater temporary workspace. Such temporary workspace easements as are necessary will be utilized for construction purposes and will terminate upon completion of construction/restoration of the pipeline right-of-way. The Commission authorized Enbridge to acquire such right-of-way easements, together with requisite property rights to the extent described in the record of Docket No. 12-0347, by purchase or by condemnation in the manner provided for by the law of eminent domain in the tracts of land set forth in the exhibits attached to the Commission's Order.

   4. The property rights authorized to and sought herein by Enbridge include the construction, operation, and maintenance of the pipeline and any associated valves, fittings, signage, protective apparatus, and other appurtenances within the permanent easement right-of-way and the rights to inspect (including by aerial patrol), remove, alter, abandon in place, replace, relocate, and reconstruct the pipeline; the right to transport crude petroleum and any product, by-product, or derivatives thereof, whether liquid or gaseous that can be conveyed through a pipeline on, over, under, in, through, along, and across the permanent easement right-of-way, together with the right to clear and keep clear such right-of-way so as to prevent damage or interference with the safe and efficient operation and patrol of the pipeline right-of-way as well as the right at any and all times to go upon said right-of-way for the exercise of such easement rights together with the right of ingress and egress to the right-of-way for all purposes convenient or incidental to such easement rights by access via the actual right-of-way, via public

ways, or via such convenient points as may be agreed from time to time with the landowner(s);
the right reasonably to limit excavation within the right-of-way and the erection therein of
permanent structures with foundations and/or which cannot be readily removed to allow access
to the pipeline, the landowner(s) retaining the right fully to use and enjoy the right-of-way
easement in ways that do not threaten the safety, integrity, and operation of the pipeline,
including inter alia the right to cross the permanent easement with utility, sewer, water, etc. lines
as well as with roads and streets; the right to preserve the grade of the right-of-way unless
otherwise agreed with the landowner(s); and the right to alienate and/or mortgage the easement
right-of-way.  The rights in the temporary workspace easements are those necessary to construct
the pipeline, including the rights to access and use the easement areas, to operate and store
construction equipment, soil, and pipe in and on the area, to clear the area, and to exclude others
from the area during construction, subject however to the requirement that reasonable access
across all easement areas during construction be provided as arranged with owners/tenants.  The
temporary easements will terminate upon completion of construction and right-of-way
restoration but generally in about one year from the date Plaintiff is given rights therein pursuant
to this Complaint.

    5.  The ORDER and Certificate In Good Standing issued by the Commission
in Docket No. 12-0347 are in full force and effect, and Plaintiff is authorized to acquire the
permanent and temporary easements pursuant to the law of eminent domain.  It is reasonably
necessary for the construction, operation, and maintenance of the Flanagan South Pipeline that
Plaintiff acquire the right-of-way easements, temporary easements, and easement rights as
described above, on, over, under, in, through, along, across, and adjacent to the tracts specified
by the Commission's ORDER of February 14, 2013, as listed in Exhibit A hereto.   Within

Livingston County, such tracts include the parcel of land owned by Defendants, as legally described in the attached Exhibit B.

      6.     The right-of-way easement, temporary workspace easement (construction easement), and easement rights described above are necessary and useful for the construction, operation, and maintenance of the pipeline sanctioned by the Commission's ORDER of February 14, 2013 to serve the public need for the provision of common-carrier-by-pipeline transportation service of crude petroleum and petroleum derivatives. The public convenience and necessity will be served by the provision of such service by Enbridge by means of the pipeline and the public purpose of satisfying the need and demand of the petroleum-consuming public in Illinois and the nation for access to a secure, dependable, and cost-effective source of crude petroleum for refining will be served by the construction and operation of Enbridge's pipeline facilities, as the Commission's ORDER found. In addition, the pipeline is necessary to, and serves the purpose of, providing adequate common-carrier transportation service and capacity for interstate and international producers and shippers of crude petroleum for Illinois-area and other American refiners of crude petroleum who supply the public's need for refined petroleum products. Such common-carrier-by-pipeline transportation service, as authorized by the Commission, is a public use and constitutes a public purpose, i.e., common carriage by pipeline of crude petroleum and other petroleum hydrocarbons.

      7.     The lands, rights, or other property interests herein described are private property, and the persons hereinafter named in connection with the specified tract are, as far as appears of record and as far as Plaintiff has been able to learn, the persons who own or otherwise are interested therein or claim to have some interests therein. Plaintiff reasonably requires, and hereby seeks to acquire by eminent domain, within the specified tract, the perpetual right and

easement to construct, operate, and maintain, as specified above, a fifty (50)-foot wide permanent easement for the placement and maintenance therein of an underground, high-grade steel pipeline not exceeding 36-inches in outside diameter together with an eighty-five (85)-foot wide temporary workspace easement alongside such permanent easement, and such other workspace easements as may be required, all as depicted and specified in the property plat and description attached hereto for said tract, such temporary easements to be used for and in connection with the construction of the pipelines, the pipeline to be installed at a minimum depth below grade as agreed by Enbridge and the Illinois Department of Agriculture (IDOA) and to be constructed and maintained in accord with the Commission's ORDER of February 14, 2013, Enbridge's "Agricultural Impact Mitigation Agreement" with IDOA, and the rules and regulations of the United States Department of Transportation set forth in 49 C.F.R. Part 195.

       8.     The names of all persons interested in the subject tract of land, as owners or otherwise, as appearing of record or as otherwise known to the Plaintiff, are as follows:

Tract IL-LV-0064.000
(Plat attached as Exhibit B)

               Owners of Record:           Michelle E. Knight and Jeffrey E. Barth
                                                6484 E. 1600 North Road
                                                Flanagan, Illinois  61740

               Parties Otherwise Interested:      Unknown Owners

       9.     Plaintiff has endeavored to agree with the owners of, and persons otherwise interested in, the aforesaid tract of land on the compensation to be paid for the purchase of the rights, right-of-way, and easements on, over, under, in, through, along, across, and adjacent to the subject tract. To that end, Plaintiff's agents and representatives have, beginning as early as 2012, sent letters and information to all landowners along the pipeline

routes, including these Defendants, identifying themselves, explaining the pipeline project, describing the easements needed and the nature and scope of the pipeline projects, and providing data required by Commission regulations concerning acquisition of right-of-way by Illinois utilities/common carriers. In addition, Plaintiff sought Defendants' permission to conduct requisite civil, environmental, and cultural/archaeological surveys of the property and to meet and confer with Defendants about the pipeline project. On or about May 2, 2013 Plaintiff presented to these Defendants an offer to purchase the necessary permanent and temporary easements, proposing therein to pay at least the full fee value of the areas needed as the permanent easement and at least thirty percent (30%) of that value for the areas needed as temporary workspace easements, such values being based upon professional study of real estate values in the area of Defendants' tract. Said offer thus exceeded in total the sum of $24,600.00. Payment for crop losses and/or incidental construction damage was also offered and Plaintiff tendered its standard easement agreement for review and consideration by Defendants. Defendants were advised of Plaintiff's desire to reach a negotiated agreement with Defendants and of the name, address, and contact numbers (phone, fax, and email) of Plaintiff's representative. In its offer, Plaintiff sought to be advised of Defendants' position(s) within a reasonable time, indicating that thereafter Plaintiff intended to initiate judicial proceedings under the Eminent Domain Act. Despite these efforts, Plaintiff has to date been unable to reach agreement with these Defendants. It is therefore necessary that Plaintiff proceed in this proceeding, pursuant to the Commission's authorization described above, to acquire such rights, right-of-way, and easements for the uses and purposes stated above, all in accordance with the eminent domain laws of Illinois. In addition to the just compensation that may be awarded in this proceeding, Enbridge stipulates that it will pay to the owner or owners of the tract of land

listed above actual damages, if any, to fences, drain tiles, crops, livestock, irrigation systems, or other improvements arising from the construction of the pipeline and the pipeline right-of-way described herein.

      10.    Plaintiff makes the persons named in Paragraph 8 defendants to this complaint for condemnation and requests that summons be issued against all of them, according to law, commanding them, and each of them, to appear before this court on the return day of the summons as provided by law.  In addition to the persons designated by name herein, there are or may be persons who may be interested in this action or may claim some right, title, or interest in the tracts described herein, whose names are unknown to Plaintiff, and all such persons are named as parties-defendant to this action by the name and description of "UNKNOWN OWNERS," and are being made subject to notice by publication.

      WHEREFORE, Plaintiff prays that process issue against Defendants; that just compensation be ascertained for the easement rights, right-of-way, and other interests sought to be acquired herein pursuant to law; that the Court order that Plaintiff may enter upon and use the pipeline right-of-way and easements upon payment of the just compensation to the parties entitled thereto or to the County Treasurer within such reasonable time as fixed by the Court; and that the Court retain jurisdiction of this cause to enter such further orders as may be necessary to resolve all matters involved in this proceeding and to allow Plaintiff to construct, operate, and maintain the aforesaid pipeline.

      PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,

OF COUNSEL:                              ENBRIDGE PIPELINE (FSP) L.L.C.

Joel W. Kanvik                           Gerald. A. Ambrose
Director, U.S. Law & Assistant Secretary Gregory H. Furda
Enbridge Energy Company, Inc.            John A. Heller
1409 Hammond Avenue                      Angela M. Weis
Superior, WI 54880                       SIDLEY AUSTIN LLP
(715) 398-4500                           One South Dearborn Street
                                         Chicago, Illinois 60603
                                         (312) 853-7000


                                         Thomas A. McConnaughay
                                         Christopher J. Spanos
                                         WESTERVELT, JOHNSON, NICOLL
                                           & KELLER, LLC
                                         411 Hamilton Boulevard
                                         Peoria, Illinois 61602
                                         (309) 671-3550

                                         Attorneys for Plaintiff


                                         By: _____
                                              Christopher J. Spanos
                                              IL ARDC No. 6230317
Dated: June 26, 2013                     One of the Attorneys for Plaintiff

# EXHIBIT A

**STATE OF ILLINOIS**

**ILLINOIS COMMERCE COMMISSION**

| | | |
|---|---|---|
| Enbridge Pipelines (FSP) L.L.C. | : | |
| | : | |
| Application pursuant to Sections 8-503, | : | |
| 8-509, and 15-401 of the Public Utilities | : | 12-0347 |
| Act/the Common Carrier by Pipeline Law | : | |
| for Certification and Authority to Construct | : | |
| and Operate a Petroleum Pipeline and when | : | |
| Necessary to Take Private Property as | : | |
| Provided by the Law of Eminent Domain. | : | |

## ORDER

DATED:  February 14, 2013

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND PROCEDURAL HISTORY ................................................. 1

II.  STATUTORY PROVISIONS .............................................................................. 2

III. BACKGROUND AND RELIEF REQUESTED ......................................................... 3

IV.  FIT, WILLING AND ABLE ................................................................................. 6

    A.   Enbridge FSP's Position .......................................................................... 7

    B.   Holder Intervenor's Position ................................................................. 16

    C.   Staff's Position ...................................................................................... 17

    D.   Commission Analysis and Conclusion .................................................. 20

V.   PUBLIC NEED/PUBLIC CONVENIENCE AND NECESSITY ............................ 21

    A.   Public Need/Public Convenience and Necessity Issues Other Than Routing ................................................................................................. 21

        1.   Enbridge FSP's Position ............................................................... 21

        2.   Staff's Position ............................................................................. 27

        3.   Commission Analysis and Conclusion on Public Need/Public Convenience and Necessity Other Than Routing ......................... 29

    B.   Location and Routing-Related Issues ................................................... 31

        1.   Enbridge FSP's Position ............................................................... 31

        2.   Dynegy Midwest Intervenor's Position ......................................... 32

        3.   Staff's Position ............................................................................. 32

        4.   Commission Analysis and Conclusion on Location and Routing-Related Issues ............................................................................. 34

VI.  SECTION 8-503 OF THE PUA ....................................................................... 37

VII. EMINENT DOMAIN ........................................................................................ 37

    A.   Enbridge FSP's Position ........................................................................ 37

B.     Staff's Position ............................................................... 38

C.     Commission Analysis and Conclusion ..................................... 39

VIII.    FINDINGS AND ORDERING PARAGRAPHS..................................... 39

STATE OF ILLINOIS

ILLINOIS COMMERCE COMMISSION

| | | |
|---|---|---|
| Enbridge Pipelines (FSP) L.L.C. | : | |
| | : | |
| Application pursuant to Sections 8-503, | : | |
| 8-509, and 15-401 of the Public Utilities | : | 12-0347 |
| Act/the Common Carrier by Pipeline Law | : | |
| for Certification and Authority to Construct | : | |
| and Operate a Petroleum Pipeline and when | : | |
| Necessary to Take Private Property as | : | |
| Provided by the Law of Eminent Domain. | : | |

## ORDER

## I.    INTRODUCTION AND PROCEDURAL HISTORY

In this proceeding, Enbridge Pipelines (FSP) L.L.C. ("Enbridge FSP" or "Applicant") filed, with the Illinois Commerce Commission ("Commission"), an application for the issuance of a Certificate of Good Standing pursuant to Section 15-401 of the Common Carrier by Pipeline Law, 220 ILCS 5/15-401(a) ("CCPL"), which is part of the Public Utilities Act, 220 ILCS 5/1-101, *et seq.* ("PUA" or "Act"), and also sought, pursuant to Sections 8-503 (220 ILCS 5/8-503) of the Public Utilities Act, the entry of an order authorizing it to construct, operate, and maintain approximately 168 miles of a new 36-inch outside diameter mainline crude oil pipeline from an Enbridge facility (the "Flanagan Terminal") near Pontiac, Illinois to the Illinois/Missouri border near Quincy, Illinois. In addition, in its application Enbridge FSP sought, under Section 8-509 (220 ILCS 5/8-509) of the Act, when necessary for the construction of said pipeline facilities, to enter upon, take, or damage private property in the manner provided by the law of eminent domain.

Pursuant to due notice, a pre-hearing conference was held in this matter on July 10, 2012, before a duly authorized Administrative Law Judge of the Commission at the offices of the Commission in Chicago. Counsel for Enbridge FSP, the Commission Staff ("Staff"), and Intervenors appeared and participated in the hearing. Petitions for leave to intervene included Virginia B. Holder and Emily Watts; Dynegy Midwest Generation, LLC; Jeffrey E. Barth, Elizabeth A. Laughlin, Ellen L. Dingledine, Lois E. Barth, Paul Duffy and Michael Duffy by the Law Office of Mercer Turner, P.C.; and the Law Office of Mercer Turner, P.C. on behalf of Maureen E. Kalkwarf. By order dated June 29, 2012, schedules were set for the submission of pre-filed testimony. Pre-filed testimony was filed by Enbridge FSP, Staff, Virginia B. Holder, and Byron Veech on behalf of Dynegy Midwest Generation, LLC. With the consent of all parties, on November 27, 2012, the Administrative Law Judge ordered that the matter be decided based on the pre-filed

12-0347

testimony, after the witnesses were appropriately sworn, and on the pleadings. A Proposed Order was served on the parties.

## II.   STATUTORY PROVISIONS

Section 15-401(b) of the Common Carrier by Pipeline Law states:

> Requirements for issuance. The Commission, after a hearing, shall grant an application for a certificate authorizing operations as a common carrier by pipeline, in whole or in part, to the extent that it finds that the application was properly filed; a public need for the service exists; the applicant is fit, willing, and able to provide the service in compliance with this Act, Commission regulations, and orders; and the public convenience and necessity requires issuance of the certificate.
>
> In its determination of public convenience and necessity for a proposed pipeline or facility designed or intended to transport crude oil and any alternate locations for such proposed pipeline or facility, the Commission shall consider, but not be limited to, the following:
>
> (1)   any evidence presented by the Illinois Environmental Protection Agency regarding the environmental impact of the proposed pipeline or other facility;
>
> (2)   any evidence presented by the Illinois Department of Transportation regarding the impact of the proposed pipeline or facility on traffic safety, road construction, or other transportation issues;
>
> (3)   any evidence presented by the Department of Natural Resources regarding the impact of the proposed pipeline or facility on any conservation areas, forest preserves, wildlife preserves, wetlands, or any other natural resource;
>
> (4)   any evidence of the effect of the pipeline upon the economy, infrastructure, and public safety presented by local governmental units that will be affected by the proposed pipeline or facility;
>
> (5)   any evidence of the effect of the pipeline upon property values presented by property owners who will be affected by the proposed pipeline or facility;
>
> (6)   any evidence presented by the Department of Commerce and Economic Opportunity regarding the current and future economic effect of the proposed pipeline or facility including, but

2

12-0347

not limited to, property values, employment rates, and residential and business development; and

(7)     any evidence presented by any other State agency that participates in the proceeding.  (220 ILCS 5/15-401(b))
Section 8-503 of the Act states, in part:

Whenever the Commission, after a hearing, shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility or of any 2 or more public utilities are necessary and ought reasonably to be made or that a new structure or structures is or are necessary and should be erected, to promote the security or convenience of its employees or the public or promote the development of an effectively competitive electricity market, or in any other way to secure adequate service or facilities, the Commission shall make and serve an order authorizing or directing that such additions, extensions, repairs, improvements or changes be made, or such structure or structures be erected at the location, in the manner and within the time specified in said order... (220 ILCS 5/8-503)
Section 8-509 of the Act states, in part:

When necessary for the construction of any alterations, additions, extensions or improvements ordered or authorized under Section 8-503 or 12-218 of this Act, any public utility may enter upon, take or damage private property in the manner provided for by the law of eminent domain. (220 ILCS 5/8-509)

## III.     BACKGROUND AND RELIEF REQUESTED

Enbridge FSP is a Delaware limited liability company with its principal office located at 1100 Louisiana, Suite 3300, Houston, Texas 77002 (ph. 713-821-2000). Enbridge FSP is a wholly owned, indirect subsidiary of Enbridge Inc. ("Enbridge") and as such is an affiliate of Enbridge Energy Partners, L.P. ("Enbridge Partners"), Enbridge Energy, Limited Partnership ("Enbridge Energy"), and Enbridge Pipelines (Illinois) L.L.C. ("Enbridge Illinois").    Enbridge is a leading company in the transportation and distribution of energy in North America.  Through its subsidiary Enbridge Pipelines Inc., Enbridge operates pipelines that, *inter alia,* traverse western Canada to transport crude oil east and south to the United States and eastern Canada.  Enbridge Partners and Enbridge Energy own and operate a series of liquid petroleum pipeline systems in the United States, including the "Lakehead System," the U.S. portion of Enbridge's operationally integrated pipeline system which operates in seven Great Lakes states, including Illinois, and the Enbridge Pipelines (North Dakota) L.L.C. system, which operates in the Williston Basin/Bakken Formation area, which encompasses portions of eastern Montana and North Dakota and ultimately interconnects directly or via affiliates

with the Enbridge Mainline System in Clearbrook, Minnesota and Cromer, Manitoba. Enbridge's Spearhead Pipeline, which is owned by CCPS Transportation, LLC, an Enbridge-owned entity that is the direct parent of Applicant, operates from Enbridge Energy's Flanagan Terminal near Pontiac, Illinois to the major national pipeline hub in Cushing, Oklahoma. (Application at 3-4)

Together with the Canadian pipeline systems of Enbridge Pipelines Inc., these systems comprise over 15,000 miles of liquid petroleum pipelines and constitute the world's longest crude petroleum and petroleum liquids pipeline network. They are the primary means of transporting crude oil from Canada to the United States as well as the only pipeline transit system that transports crude oil from western Canada to eastern Canada. Overall, Enbridge's pipelines transport over two-thirds of western Canada's crude oil production and deliver some 12% of U.S. imports of crude oil. (Application at 4)

Enbridge Partners and Enbridge Energy were certificated as common-carriers-by-pipeline in Illinois by this Commission in its Order in Docket No. 06-0470 and authorized to construct, operate, and maintain in Illinois pipeline facilities known as the Southern Access Expansion Pipeline and the Southern Lights Pipeline. Enbridge Illinois was certificated in Docket No. 07-0446 to construct the Southern Access Extension Pipeline. These pipelines operate, or when completed will operate, cooperatively to provide interstate common carriage of crude oil. Order, April 4, 2007, Dkt. No. 06-0470; Order, July 8, 2009, Dkt. No. 07-0446. (Application at 4-5)

Another Enbridge business segment -- the Natural Gas Transportation business unit -- includes partnership interests in the Alliance and Vector interstate natural gas pipeline systems and the Aux Sable natural gas processing facility. Each of these systems or facilities operates in Illinois. Enbridge also owns and operates natural gas gathering and transmission gas pipelines in the U.S. Gulf Coast, and natural gas local distribution systems in eastern Canada, including Canada's largest in the Toronto metropolitan area. (Application at 5)

The Applicant states that Enbridge's pipelines constitute an interstate common carrier pipeline system that charges tolls to shippers of crude petroleum and other petroleum liquids; these pipeline entities are not involved in producing or refining petroleum. Within the U.S., Applicant asserts, all tariff rates, applicable surcharges, and terms of shipment for transportation of liquid petroleum through Enbridge pipelines are established and governed by tariffs filed with and regulated by the Federal Energy Regulatory Commission ("FERC") under the authority of the Interstate Commerce Act of 1887. Applicant contends that as interstate liquid pipelines, the construction, operation, and maintenance of Enbridge's pipelines are exclusively regulated by the United States Department of Transportation ("DOT"), Pipeline and Hazardous Materials Safety Administration ("PHMSA"), Office of Pipeline Safety ("OPS") pursuant to various federal laws and regulations, primarily 49 C.F.R. Parts 194 and 195. (Application at 5)

In addition to its petroleum and natural gas systems, Enbridge has a growing presence in renewable energy, including solar, wind, waste-heat recovery, geothermal,

12-0347

and fuel-cell technologies. Enbridge owns the Chin Chute wind project, a 30-megawatt wind-energy facility near Lethbridge, Alberta, Canada; 90% of the 99-megawatt Talbot wind-energy facility in eastern Ontario, Canada; and 100% of the new 250-megawatt Cedar Point wind-energy facility in Colorado. Enbridge also owns the Tilbury and Amhertsburg II solar-energy facilities in Ontario, Canada, which combined produce 20-megawatts of electricity, along with its recently completed 80-megawatt Sarnia Solar project; and it has also recently acquired the 50-megawatt Silver State North photovoltaic facility in Nevada. To date, Enbridge's investments in renewable-energy systems in North America exceed $2.5 billion (except as noted, all figures are U.S. dollars), and it has acquired nearly 1,000 megawatts of renewable energy capacity. Enbridge has committed itself to a long-term objective of offsetting each kilowatt of incremental conventional electricity it consumes in its operations with an equal amount of sustainable or alternatively sourced electric power. (Application at 5-6)

Enbridge and its affiliates employ over 10,000 people, primarily in Canada and the United States. The common stock of Enbridge is widely held and is publicly traded on both the Toronto Stock Exchange ("TSX:ENB") and the New York Stock Exchange ("NYSE:ENB"). In 2011, Enbridge had total capitalization of Cdn $34.3 billion and earnings applicable to common stockholders of Cdn $991 million. Enbridge maintains its corporate headquarters in Calgary at 425-1st Street S.W., Calgary, Alberta T2P 3L8 Canada. (Application at 6)

In the instant proceeding, Enbridge FSP is proposing to construct a new 36-inch outside diameter mainline pipeline as part of the "Flanagan South Pipeline Project" originating at Enbridge's Flanagan Terminal near Pontiac, Illinois and running generally adjacent to Enbridge's Spearhead line to the Illinois/Missouri border near Quincy, Illinois, where it then will continue on through Missouri and the southeast corner of Kansas to terminate at Cushing, Oklahoma. Applicant states that the network of pipeline interconnections and petroleum storage facilities (a "hub") at Cushing, Oklahoma is one of the most important crude oil hubs in the world and is the location of settlement prices for New York Mercantile Exchange contracts for so-called "West Texas Intermediate" crude oil, a critical element in the benchmark pricing of crude oil in the western hemisphere. Applicant represents that Enbridge has the largest crude oil breakout and storage terminal in the Cushing area, having some 15.9 million barrels of storage capacity, with an additional 3.5 million barrels of tankage under construction. (Application at 12)

Applicant states that the Project's new underground pipeline will run for approximately 168 miles in Illinois. The Project will also include three pump stations in Illinois to be collocated with existing facilities. Construction is anticipated to commence in August of 2013, with an in-service date of mid-2014. (Application at 1)

Applicant represents that the overall cost of the Flanagan South Pipeline Project is expected to be approximately $2.8 billion. The Illinois portion of the Project is projected to be about 32% of the total cost, or an investment of approximately $901 million within the State. Applicant states that it plans to begin construction in May

5

12-0347

2013 and place the pipeline in service about mid-2014. Over 90% of the planned route of the Flanagan South Pipeline in Illinois will parallel the existing Spearhead Pipeline. The longest deviation from the Spearhead route will be near Quincy, Illinois, where the route will change for about five to six miles to bypass congestion on the Spearhead route at Quincy. (Application at 14)

Applicant points out that the great majority of the Spearhead right-of-way is comprised of tracts whose easements grant Enbridge multiple-line rights in the property, for which reason Applicant contends that collocation of the Flanagan South and Spearhead pipelines is the most effective, least burdensome method of routing the new pipeline. Approximately 70% of the parcels to be crossed by the Flanagan South Pipeline are pre-existing Spearhead tracts with multiple-line rights. Applicant states that the new pipe will be generally installed at a 50-foot offset from the center line of the Spearhead Pipeline to ensure adequate space for safe construction and on-going maintenance activities. Applicant asserts that such collocation of these lines means routing-related issues will be minimized. (Application at 14-15)

In addition to the pipeline itself, Applicant currently plans to add pumping capacity at its existing Spearhead pump stations at the Flanagan Terminal (milepost zero:5 pumps), at the Forest Pump Station in Mason County (milepost 76.30:4 pumps), and at the Quincy Station (milepost 162.50:4 pumps) in Adams County. Each pump will have a 5,750-horsepower electronic motor. At the Forest and Quincy Stations, Applicant states that the new pumps will require approximately ten acres of additional space adjacent to each established site, which Enbridge will acquire in fee. Needed electrical power and facilities will be acquired from the local utility. New pumping capacity will also be added at four other stations along the overall route outside Illinois. (Application at 15)

Applicant believes that the Application has been properly filed; a public need exists for the transportation of crude petroleum by the pipeline facilities Applicant intends to construct; Applicant is fit, willing, and able to provide common-carrier-by-pipeline service; and the public convenience and necessity requires the granting of the requested certifications and authorization. (Application at 3)

## IV.   FIT, WILLING AND ABLE

Enbridge presented evidence intended to show that it is "fit, willing, and able to provide the service in compliance with this Act, Commission regulations and orders" within the meaning of Section 15-401(b) of the Act, 220 ILCS 5/15-401(b). No Intervenor contended otherwise. Staff initially took the position that Enbridge had failed to demonstrate it was fit, willing, and able to construct and operate the proposed pipeline, based principally on concerns over Enbridge's ability to operate the pipeline safely. After Enbridge provided more information in rebuttal testimony, as well as in answers to Staff data requests that addressed Staff's concerns, Staff now is of the opinion that subject to certain specified conditions, Enbridge is fit, willing, and able to construct and operate the pipeline.

6

12-0347

## A.    Enbridge FSP's Position

With respect to whether it is "fit, willing, and able," Enbridge claims that Enbridge and its predecessors have a long history of successfully operating common carrier pipelines in Canada, the United States, and Illinois. Today, Enbridge is one of North America's major independent pipeline systems, *i.e.*, not owned by/affiliated with an oil-producing or refining company, and the Enbridge Mainline System transports the majority of the crude oil produced in western Canada and is the major source of crude oil supply for much of the refining demand in the Midwest, including in Illinois and in eastern Canada. (Application at 23-24)

Enbridge believes its willingness to serve is demonstrated by the commitment of Enbridge's Board of Directors to provide the capital needed to construct and place into operation the new pipeline, now estimated to be $2.8 billion. Enbridge contends that Enbridge's financial strength and access to capital markets in Canada and the United States, as discussed in the Application and the financial statements submitted therewith, demonstrate that Enbridge is capable of financing the Flanagan South Pipeline and that Enbridge is committed to the Project. Also, Enbridge FSP is qualified to do business in Illinois and the necessary steps are in progress to construct the new line and place it in operation in order to deliver vitally important crude oil beginning mid-2014. Enbridge points out that it intends to use the Spearhead right-of-way as the major part of the route of the Flanagan South Pipeline, thus facilitating construction. As well, Enbridge states that efforts have been undertaken to conduct detailed civil, environmental, and archeological surveys along the proposed right-of-way; construction specifications have been developed; pipe fabrication has been scheduled; and notice of its Application has been provided to the pipelines, railroads, telecommunications companies, county boards, municipal governments, and regulatory agencies listed on Exhibit I to the Application. Further, Enbridge compiled, and appended to its Application pursuant to 83 Illinois Administrative Code § 200.150(h), a list of the owners of record of privately owned tracts of land upon or across which Applicant expects to construct the new Flanagan South Pipeline and pump stations. (Application at 29-30) Finally, in the last few years, this Commission has twice found Enbridge and Enbridge affiliates to be "fit, willing and able" by certificating the Southern Access Expansion, Southern Lights, and Southern Access Extension pipelines. *See Order*, April 4, 2007, Dkt. No. 06-0477, and *Order*, July 8, 2009, Dkt. No. 07-0446.

Enbridge says that its record in Illinois shows that it can construct and operate the new pipeline in a safe and environmentally sound manner. As part of the Enbridge Mainline System, Enbridge FSP will participate as an industry leader in applying pipeline-control and leak-detection systems and advanced computerized control, monitoring, and detection equipment along the pipeline network. These include advanced SCADA (Supervisory Control and Data Acquisition) systems that constantly monitor sensing devices placed along the Enbridge systems to track the pressure, temperature, density, and flow of liquid petroleum under transport and display each movement's status to operators in the Operations Control Center in Edmonton, Alberta, and a subsystem of SCADA, known as CPM (Computational Pipeline Monitoring System), which has the ability to analyze deviations in the flow of liquids through the

12-0347

pipelines, thus allowing operators to identify small leaks that would otherwise not be as readily detectable remotely.  Through these systems, Enbridge's operators in the Edmonton Control Center can maintain its pipelines within established operating parameters and can remotely and automatically shut down pump stations and isolate pipeline segments when they observe abnormal conditions or if safety parameters are exceeded.  Also included as part of Enbridge's extensive effort to prevent and detect leaks are detailed maintenance programs, regular inspections, and comprehensive public awareness/education efforts.  (Application at 24)

Enbridge's lines are built and maintained in accordance with industry and governmental requirements and standards, and often in excess thereof.  As are all Enbridge pipelines, the new pipeline is designed to withstand pressures over and above its normal operating pressure.  The pipe will be plant-coated with 14-mil external fusion-bonded epoxy to protect against external corrosion (coating in the controlled environment of a pipe plant greatly enhances the efficacy of the process; coating is re-inspected in the field and additional coating is applied to all pipe welds).  Generally, the line will be installed at a minimum depth of four feet below grade (thus exceeding federal requirements) when it parallels the existing line; otherwise, in prime agricultural areas, the pipe will be installed at a minimum depth of five feet below grade.  The line will also be installed at a depth of five feet or greater where required for particular conditions such as road and water crossings, etc.  Advanced excavation, soil-separation, and decompaction and restoration techniques will be employed to preserve soil productivity and profiles and all disturbed areas will be reclaimed to reflect pre-construction contours, grades, and vegetative cover (within confines of other applicable regulatory permits/approvals) or otherwise mitigated.  To avoid soil mixing, all work-area top soils, not just the trench areas, will be stripped and stored separately.  To assure minimal impacts on agricultural properties, as was done for prior Enbridge pipelines in Illinois, such as the Southern Access, Southern Lights, and Extension pipelines, Enbridge has entered into an Agricultural Impact Mitigation Agreement with the Illinois Department of Agriculture that provides comprehensive procedures to deal with productivity, erosion, access, and other issues of concern in agricultural areas.  (Application at 25-26)

The actual installation of the pipeline will be subject to regulatory inspection, including by Pipeline and Hazardous Materials Safety Administration ("PHMSA") inspectors operating from the agency's Central Region office in Kansas City, Missouri and field office in Des Plaines, Illinois.  Enbridge will employ construction, safety, and environmental inspectors not affiliated with its pipeline contractors to assure compliance with Enbridge's contract specifications for pipeline construction, which specifications incorporate all regulatory and industry requirements.  Along the pipeline route, numerous remotely controllable isolation valves will be installed, including at major water-body crossings such as the Vermillion, Illinois and Mississippi Rivers, to allow rapid isolation of impaired line segments in the event of an emergency.  Such valve sites will be linked to the Control Center by modern communication facilities.  During and after installation, the line will be subjected to careful testing to verify its integrity and compliance with all regulatory standards and contract specifications.  Such testing will

include checking coating integrity; examining by non-destructive testing 100% of field welds (well above the 10% required by regulation); internally inspecting the entire length of the line by using an in-line inspection tool known as a caliper pig; and hydrostatically testing the pipeline. The line's operating pressure will comply with Federal regulatory standards (generally 72% of the specified minimum yield strength of the pipe). The line will go into service only after inspection and thorough commissioning to verify compliance with all construction standards and requirements. Enbridge states that the construction and installation of the Flanagan South Pipeline must, and will, also meet the environmental impact and protection standards of the numerous federal, state, and local agencies that may have jurisdiction over environmental factors along Enbridge's route. These include the U.S. Army Corps of Engineers ("ACE"), the Illinois Department of Natural Resources ("DNR"), and the Illinois Environmental Protection Agency ("IEPA"). (Application at 26-27)

Compliance with regulatory requirements applicable to pipeline construction is only part of Enbridge's commitment to protecting and enhancing the environments in which its lines and facilities operate. Enbridge says that it expends many millions of dollars annually to maintain, protect, and upgrade its pipelines and other facilities. Enbridge contends that Enbridge's detailed "Operating and Maintenance Procedures," which include regularly scheduled maintenance inspections and tests and are periodically inspected by PHMSA for compliance with federal requirements, will be applied to the Flanagan South Pipeline Project. All Enbridge pipelines are marked with signage and warnings, per federal regulations, at road and highway crossings, navigable rivers, and other locations to alert the public to the presence of underground lines and to provide information, contact numbers, and emergency data. Enbridge maintains emergency-response equipment and personnel at strategic points along its routes -- and will supplement existing Spearhead line resources as needed for the Flanagan South Pipeline – and trains its personnel to deal with pipeline emergencies. An emergency response plan, required by 49 CFR Part 194 and approved by PHMSA, is in place and force and specialized response-services providers have been identified to supplement Enbridge's resources if necessary. (Application at 27-28)

Enbridge has high standards for environmental protection, as demonstrated by its record in Illinois where its lines have operated since 1968. In that span of over forty years, Enbridge/Lakehead has had few mainline releases within Illinois large enough to be reported under applicable federal regulations. Enbridge states that two of these, including the most substantial at Elgin in 1986, were caused by improper excavating or equipment operation within the pipeline right-of-way. In all cases, the pipeline was shut down and the release was promptly and effectively contained and mitigated by Enbridge. Given the many billions of barrels of liquid petroleum transported into and through Illinois by Enbridge/Lakehead since 1968, Enbridge contends that Enbridge's history in Illinois is a positive record of safe, environmentally conscious operation, which record Enbridge is committed to maintaining and improving. Moreover, that history shows that in those rare instances where accidents and mistakes happen, Enbridge deals with, corrects, and takes responsibility for such matters. (Application at 28)

9

Jerrid A. Anderson, P.E., Director of the Flanagan South Pipeline Project, responded to the direct testimony of Staff witness Mr. Maple which questioned whether the three release situations that have taken place in the past two and a half years show that Enbridge is not able to construct and operate the proposed line safely as required by the Common Carrier by Pipeline Law. The three incidents in question occurred at Marshall, Michigan and Romeoville, Illinois in 2010, and at Grand Marsh, Wisconsin in July of 2012.

Mr. Anderson testified that these incidents should be considered in the overall context of the industry and Enbridge's place in it. (Enbridge Ex. 7, at 6) According to Mr. Anderson, Enbridge operates ten percent (10%) of the total length of all crude petroleum and refined products pipelines and is the largest pipeline operator in the United States. It operates the greatest number of system miles of pipeline, operates the greatest number of crude oil pipelines, and has for the last decade transported hundreds of millions of barrels of liquid petroleum – unrefined and refined – each year with very few accidental releases. (Enbridge Ex. 7, at 6) While acknowledging that any release is unacceptable and Enbridge and the rest of the industry strive to achieve a zero-release goal – an objective that Enbridge attained in 2011 in its mainline transport operations – Mr. Anderson points out that the entire pipeline industry has substantially improved its release performance in the last decade and Enbridge has led the way in that effort. When normalized to billion barrel-miles to allow comparisons, Enbridge's rate of mainline releases (outside of company property) is consistently lower than that of the remainder of the industry. (Enbridge Ex. 7, at 6-7)

Mr. Anderson states that, when viewed against this context, the Marshall, Romeoville, and Grand Marsh incidents are not characteristic of Enbridge's operations and performance. (Enbridge Ex. 7, at 10) In particular, he states that while Enbridge takes responsibility for and does not deny that each incident, particularly the Marshall, Michigan release, revealed some imperfection in Enbridge's processes and procedures, it is important to understand the root cause of each incident and the steps Enbridge has taken to prevent or reduce any such releases in the future. (Enbridge Ex.7, at 10-11)

Mr. Anderson states that the Marshall release, for example, which was the most significant, resulted from the failure of the anti-corrosion tape coating used when the pipeline was constructed in 1969. Tape was the industry's preferred corrosion-prevention technology at the time. It has been determined that under certain conditions, tape coating will lose adhesion and disbond (separate) from the pipe. This causes "tenting" which can impair and impede cathodic protection systems used to prevent corrosion. Corrosion resulting from the tape failure caused pipe damage at Marshall that allowed a release. (Enbridge Ex. 7, at 11) Mr. Anderson also acknowledges that that release was then greatly exacerbated by operational failures in the Enbridge Control Center when Line 6B, which had been shut down as part of regular operations (the line was not in a state of continuous flow), was restarted. Various mistakes and failures in recognizing and addressing operational alerts caused a release situation to go unrecognized for too long. (Enbridge Ex. 7, at 11-12)

Mr. Anderson describes how at Romeoville, Enbridge's Line 6A, which was also built in the late 1960s, suffered a breach caused by outside (non-Enbridge/non-pipeline) actions and forces in September 2010.  The line was rapidly shut down, response teams arrived on site in just hours to contain released crude, and all affected areas were mitigated promptly and completely.  Mr. Anderson states that an investigation of the cause of the release is on-going under the direction of the National Transportation Safety Board.  Although the NTSB has not yet released a report on this incident, and may not do so, Enbridge's own investigation determined that (1) a circular hole approximately two inches in diameter penetrated through the bottom of the pipe from the outside, (2) someone had installed a water pipe underneath and too close to Line 6A without notifying or advising Enbridge, and (3) the hole in Enbridge's pipeline was directly above a hole in the water pipe (which was still gushing water when the pipeline was uncovered) and that whoever had installed the water line had backfilled the site with large stones and rocks.  (Enbridge Ex. 7, at 12)

The incident at Grand Marsh, Wisconsin, involved Enbridge's Line 14, which was constructed and placed in service in 1998.  Mr. Anderson states that although the investigation is not complete, it appears that the release there was caused by the failure of a long stem weld seam in a piece of the pipe.  The particular pipe used for Line 14 was manufactured using a process called electric resistance welding, or "ERW" welding, on the longitudinal seam of the pipe.  (Enbridge Ex. 7, at 12-13)

Mr. Anderson states that due to the Flanagan South Pipeline's design and construction, the new pipeline cannot experience the failure mechanisms that occurred in the Marshall and Grand Marsh releases, respectively.  Unlike Line 6B in the Marshall incident, where the release resulted from the failure of the anti-corrosion tape coating used when the pipeline was constructed, the Flanagan South Pipeline will have its corrosion-protection epoxy coating fusion bonded to the pipe at the factory, where all pipe sections will be inspected by/for Enbridge.  Similarly, the ERW welding technology used in the manufacture of Line 14 that was involved in the Grand Marsh incident will not be used on the Flanagan South Pipeline.  Instead, the manufacturer will use double submerged arc welding or "DSAW" to produce the seam welds.  (Enbridge Ex. 7, at 13)

With respect to the Romeoville release, Mr. Anderson stresses that Enbridge's ability to protect its lines against external-force damage, such as what caused the Romeoville release, is not entirely a matter of technology.  (Enbridge Ex. 7, at 13) However, he states that post-Marshall, Enbridge has increased the resources and personnel allocated to its pipeline-integrity and public awareness program and continued to work with industry members and public authorities to improve facility-location/protection programs, such as the "811 Call Before You Dig" number.  He argues that all these efforts will help protect the Flanagan South Pipeline against outside-force damage.  In addition, he states that because much of the Flanagan South Pipeline route will be collocated with the Spearhead Line right-of-way, the new line will benefit from public awareness of an established pipeline corridor and Enbridge's ability to use the combined ROW space to buffer both lines from intrusions.  (Enbridge Ex. 7, at 13-14)

1:12-cv-01244-JES-JEH   # 31   Page 32 of 71

Mr. Anderson also responded to Mr. Maples' request for greater understanding of Enbridge's policy and practice improvements undertaken to enhance system integrity and safety as a result of the foregoing incidents. Mr. Anderson first corrected any impression that Enbridge was not adopting all of the NTSB-recommended actions based on its investigation of the Marshall incident, stating that "We either already are or will soon be fully implementing all the NTSB recommendations...." (Enbridge Ex. 7, at 14) The actions that Mr. Anderson states Enbridge has or will be taking are those set out below:

 A. With respect to Pipeline Integrity, Enbridge has already taken or will take the following actions:

- The external tape coating applied to Line 6B, which was the root of the failure, will not be utilized on the proposed pipeline;

- Implementation of changes to the integrity management program to assure improvements to long-term monitoring and mitigation policies;

- Changes to inspection frequencies, repair methodologies, quality assurance programs, detailed procedure enhancements, additional technologies, and organizational restructuring;

- Increased integration of planning and issue resolution formalized through new committees and planning processes;

- Re-organization of the functional areas responsible for pipeline and facility integrity resulting in a doubling of the number of positions dedicated to integrity;

- An increase in pipeline integrity management spending in 2011 and 2012 resulting in an increase in the number of in-line inspection programs and integrity digs (including excavation, examination, maintenance and repair by welded sleeve or pipe segment replacements);

- Strengthened focus on the tools, technologies, and strategies to ensure pipeline networks perform safely, reliably, and in an environmentally responsible manner; and

- Implementation of process and procedure enhancements to ensure that a feature similar to the one that led to the Line 6B Marshall incident will be identified and repaired.

 B. Regarding its Leak Detection Program, Enbridge plans the following actions:

- Implementation of additional leak detection analysis procedures;

- Establishment of a Pipeline Control Systems and Leak Detection department;

- Enhancement of the Leak Detection Analyst Training Program;

- Implementation of a Leak Detection Instrumentation Improvement Program; and

- Implementation of changes to the Pipeline Control Systems to improve controller decision support systems.

C.    Enbridge will also augment its pipeline control capacity, including Control Center Operations ("CCO"), through the following actions:

- Development and implementation of corporate and CCO specific "Golden Rules" (safe operating, when in doubt -- shutdown, emergency procedures);

- Revision of and enhancement to all procedures pertaining to decision making, handling pipeline start-ups and shutdowns, leak detection system alarms, communication protocols, and suspected column separations;

- Revisions to documents associated with the newly revised processes and procedures;

- Augmentation to CCO staff, technical support, engineering and operator positions and enhancement to the organizational structure to better support operators and to manage span of control and workloads;

- Enhancement of training programs in all areas;

- Consolidation, in November 2011, of the new CCO for operation of most Enbridge liquid pipelines in North America to Edmonton, Alberta, Canada; and

- Emphasis on Enbridge's clear message that it operates its pipelines safely and if, for any reason, the pipelines cannot be operated safely, they will be shut down and will not be restarted until Enbridge knows exactly what is going on.

D.    In addition to the operational changes noted above, Enbridge also plans to implement changes to its Pipeline Public Awareness and Emergency Response Programs by:

- Development of an online and in-person training tool to provide Enbridge-specific information to emergency responders in its host communities;

- Addition of Community Relations positions in key locations along Enbridge liquid pipeline routes;

- Increased spending ($50 million) between 2012 and 2013 to improve equipment and capabilities, develop better tools to deal with particular waterborne spills, and improve training programs;

- Implementation of specialized training for a cross-business unit response team, to respond to large-scale events anywhere in North America that

13

12-0347

would require more resources than a single Enbridge liquid pipeline operating region or business unit could provide;

- Conducting an emergency-response preparedness assessment to identify additional strategic equipment purchases to enhance capabilities to more rapidly respond and contain a significant release anywhere in the Enbridge system; and

- Additional personnel in each Enbridge liquid-pipeline operating region to improve emergency-preparedness planning and coordination.

(Enbridge Ex. 7, at 15-17)

In concluding its response to Staff's discovery, Enbridge also made the following commitment, which Mr. Anderson reaffirmed in his rebuttal testimony:

> "The new Flanagan South Pipeline will benefit from the heightened importance and top priority status placed on integrity management because the pipeline will be designed and constructed with the application of the latest technologies that have been established to improve overall pipeline reliability;
>
> Because Enbridge has strengthened and improved the overall reliability of the pipeline system, the Flanagan South Pipeline will not be exposed to the same conditions that caused the Line 6B Marshall incident; and
>
> All of the enhancements implemented by Enbridge following the July 2010 Michigan incident and NTSB Recommendations with respect to the Pipeline Control, Leak Detection, Pipeline Public Awareness Program and Emergency Response Preparedness are appropriate to and will be applied by Enbridge in its prevention and risk mitigation of the Flanagan South Pipeline."

(Enbridge Ex. 7, at 17)

Finally, Mr. Anderson responds to Mr. Maple's suggestion that a release from the Flanagan South Pipeline could be "disastrous" for landowners along the route, and particularly harmful to agricultural land along the Flanagan South Pipeline route. Mr. Anderson points out that in all three situations discussed by Mr. Maple and addressed by himself, Enbridge either has mitigated, or is in the process of fully mitigating, the effects of the releases.  (Enbridge Ex. 7, at 18)

At Romeoville, the release was confined to a limited area, prevented from entering a nearby river, kept out of the main processor of a sewage-treatment facility, and had only minor impact on the landowners other than for one property, a NICOR facility right at the release site that Enbridge bought to use as a command center/monitoring location.  (Enbridge Ex. 7, at 18)  Mr. Anderson states that the Grand

14

Marsh release was rapidly contained and quickly remediated and Line 14 was returned to service in about a week. (Enbridge Ex. 7, at 18)

Mr. Anderson argues that the situation at Marshall was and is more complex and more costly to remediate, principally because released crude flowed into the Kalamazoo River and then downstream for some distance. (Enbridge Ex. 7, at 18) Recreational use of the river was not permanently impaired and neither public water sources nor agriculture were adversely affected. (Enbridge Ex. 7, at 19) He also contends that the release itself did not force 150 families to be "permanently relocated from their homes," as claimed by Mr. Maple in Staff Ex. 1 at 21. Some temporary evacuations did occur, he says, but the relocations were "entirely voluntary." (Enbridge Ex. 7, at 19) Mr. Anderson describes how, in order to address concern about housing-market impact, Enbridge instituted a home-purchase program by which it would purchase at pre-incident, fair market value any home in a defined zone along the river. He says that over 150 families elected to participate in the program. He says that this program was a substantial part of the unprecedented mitigation effort Enbridge undertook, which as Mr. Maple notes, cost of hundreds of millions of dollars (a cost borne by Enbridge and insurers, not shipper/customers). According to Mr. Anderson, the Michigan response proves that Enbridge takes responsibility or "ownership" and makes things right if something goes wrong. (Enbridge Ex. 7, at 19)

As for the suggestion that a release would be particularly harmful to agricultural land along the Flanagan South Pipeline route, this is not borne out by Enbridge's experience. (Enbridge Ex. 7, at 19) Agricultural properties, being generally rural, are less subject to outside-force intrusions and releases are generally manageable. Top soil can be remediated or replaced if necessary and crop losses are fully compensated if they occur. Mr. Anderson states that since oil is less dense than water and most underground aquifers are deep-sourced, there is little history of contamination from released oil. In addition, he points out that the new line will be constructed in accord with the Agricultural Impact Mitigation Agreement Enbridge has entered into with the Department of Agriculture. Equally important, Enbridge makes every effort to accommodate landowner concerns in siting the line by avoiding ponds, trees, and their sensitive areas. (Enbridge Ex. 7, at 19-20)

In his Sur-Rebuttal Testimony, Mr. Anderson expresses Enbridge's pleasure that, after reviewing Mr. Anderson's Rebuttal Testimony, including Enbridge's attached responses to Staff data requests ENG 1.69 and 1.70 and Intervenor Holder's ten data requests, Mr. Maple has changed his recommendation and now finds that Enbridge is conditionally fit, willing, and able to construct and operate the proposed pipeline. (Enbridge Ex. 8, at 1) Mr. Anderson also notes with approval that Mr. Maple now recommends that the Commission grant Enbridge a certificate in good standing and the authority to exercise eminent domain if negotiations with landowners are unsuccessful. (Enbridge Ex. 8, at 1)

Mr. Anderson makes clear that Enbridge agrees to the conditions recommended by Mr. Maple, particularly that Enbridge implement all of the actions and enhancements

listed on pages 15-17 of Mr. Anderson's rebuttal testimony. (Enbridge Ex. 8, at 1-2) Mr. Anderson further makes clear that Enbridge does not object to Mr. Maple's recommendation that the Commission order Enbridge to file a quarterly report with the Director of the Safety and Reliability Division of the Commission that gives the status of the pipeline construction and an update of Enbridge's response to ENG 1.74 giving the status of each action, nor does Enbridge object to Mr. Maple's further recommendation that these quarterly reports continue to be filed until Enbridge has finished constructing the Illinois portion of the pipeline and has completed all of the action items contained in Mr. Maple's rebuttal testimony. (Enbridge Ex. 8, at 2)

## B.    Holder Intervenor's Position

Intervenor Virginia B. Holder argues that there are unresolved safety and agricultural impact issues that are raised by the Flanagan South Pipeline with respect to two parcels of land in Mason County, Illinois as to which she is "a 4th and 5th generation landowner and landowner agent." (Holder Direct Test., at 1) More specifically, she alleges that Enbridge has as yet failed to provide answers to the following questions:

- "How does Enbridge propose to construct the pipeline over important county drainage ditches that run through our land?

- Who or what published the report that bitumen (the material traveling the proposed pipeline maintains a temperature of not greater than 99 degrees Fahrenheit (as the land agents declared); when our information indicates bitumen in transport maintains temperatures well in excess of 100 degrees Fahrenheit?

- How would a pipeline leak affect the water table and soil composition?

- How severely will the pipeline construction compact the soil? And how long will these adverse effects last?

- What happens to continuing safety concerns, obligations, and responsibilities if or when Enbridge is purchased, dissolves, or otherwise ceases?"

(Holder Direct Test., at 1-2).

In addition, Ms. Holder reported that her tenant farmer, Randy Friedrick, had raised certain questions related to the impact of the proposed pipeline on "the actual farming." (Holder Direct Test., at 2) His concerns related to (1) whether, if the pipeline were to leak underground, there might be little above ground evidence initially, and the leak will go directly into the aquifer running through the land; (2) whether there would be compensatory payments for the significant negative ground impaction for up to 10 harvest seasons that he alleged could occur; (3) whether Enbridge will include in its valuation of the easement or its offers to landowners what he alleges is the unwillingness to those farms that will be involved in the pipeline; and (4) his allegations that Enbridge does not have a current record of safety or performance which would indicate their ability to prevent or react appropriately to a leak, particularly when, he

contends, "one small leak on our land will potentially offset two counties' water supply." (Holder Direct Test., at 3)

### C.    Staff's Position

Staff witness Janis Freetly expressed Staff's opinion that Enbridge FSP, through its relationship with Enbridge, has the financial capability to construct, operate and maintain the proposed pipeline from near Pontiac, Illinois to the Illinois/Missouri border near Quincy, Illinois and collocate seven pump stations with existing facilities. (ICC Staff Ex. 2.0, at 2)

Ms. Freetly notes that according to Enbridge FSP's Application, the total cost of the proposed pipeline expansion is $2.8 billion. (ICC Staff Ex. 2.0, at 2) Ms. Freetly states that Enbridge FSP plans to finance the proposed construction initially with short-term inter-company loans from its ultimate parent company, Enbridge. She notes that the Enbridge Board of Directors has approved the expenditure of the necessary funding for Enbridge FSP and has committed Enbridge to supply the necessary financing. Ms. Freetly states that post completion of the project, outstanding short-term debt will be refinanced with a combination of long-term inter-company debt and equity provided by Enbridge. The debt/equity ratio of Enbridge FSP will be approximately 45%/55%. (ICC Staff Ex. 2.0, at 2)

Ms. Freetly also states that Enbridge has access to sufficient capital to provide Enbridge FSP with the capitalization necessary to construct, operate and maintain the proposed pipeline. (ICC Staff Ex. 2.0, at 2-3) At May 31, 2012, she says Enbridge had Cdn $7.4 billion (US $7.5 billion) available under unused credit facilities, of which Cdn $2.5 billion was used to support commercial paper. According to Ms. Freetly, Enbridge can access funds from the credit facilities to finance expansion projects. Due to its stable credit ratings, Enbridge also has sufficient access to capital from debt and equity markets, which can be used to replay short-term borrowings or finance new growth projects over the long-term. (ICC Staff Ex. 2.0, at 3)

Ms. Freetly further notes that Standard & Poor's ("S&P") assigned Enbridge a long-term corporate credit rating of A-. (ICC Staff Ex. 2.0, at 3) According to S&P, an A- rated company has a strong capacity to meet its financial obligations. Ms. Freetly also states that Enbridge's issuer rating is Baa1 from Moody's Investors Service ("Moody's"), which assigns the Baa rating to companies with moderate credit risk. (ICC Staff Ex. 2.0, at 3) She notes that having considered Enbridge's aggressive growth through various expansion projects, both rating agencies have a stable outlook for Enbridge. Thus, Ms. Freetly concludes that in her judgment, Enbridge is capable of providing Enbridge FSP the funds needed for the pipeline expansion proposed in this proceeding. (ICC Staff Ex. 2.0, at 3)

Staff witness Mark Maple, who is an experienced engineer, agreed that Enbridge FSP's Application was properly filed (ICC Staff Ex. 1.0, at 5), that Enbridge FSP had demonstrated a public need for the pipeline and the common-carrier-by-pipeline services it will provide (ICC Staff Ex. 1.0, at 5), and that the public convenience and

necessity is served by Enbridge's right-of-way acquisition program and procedures and by the route Enbridge has selected for the new pipeline. (ICC Staff Ex. 1.0, at 9) However, initially he also took the position, reflected in his Direct Testimony, that Enbridge had failed to demonstrate it was fit, willing, and able to construct and operate the proposed pipeline due to concerns he had about Enbridge's ability to safely construct and operate the pipeline. (ICC Staff Ex. 1.0, at 3)

In particular, Mr. Maple expressed concern that in July 25, 2010, Enbridge had a major pipeline spill of approximately 843, 444 gallons of crude oil in a wetland in Marshall, Michigan; that two months later on September 12, 2010, an Enbridge pipeline leaked approximately 449,232 gallons of crude oil in Romeoville, Illinois; and that on July 27, 2012, an Enbridge pipeline in Grand Marsh, Wisconsin released approximately 50,400 gallons of oil. (ICC Staff Ex. 1.0, at 18) Mr. Maple stated that (1) these spills, (2) the NTSB's findings concerning the Michigan spill – that the leak was caused by a number of Enbridge errors including a lack of employee training, deficient integrity management procedures, insufficient public awareness and education, and failure to have a sufficient disaster plan, and (3) comments by representatives of the Federal Government, give the appearance that Enbridge has some serious flaws in the way that it builds and/or operates its pipelines. (ICC Staff Ex. 1.0, at 20)

In his Rebuttal Testimony, Mr. Maple revised his earlier view that Enbridge had failed to demonstrate it was fit, willing, and able to construct and operate the proposed pipeline. (ICC Staff Ex. 3.0, at 2) Mr. Maple's change of opinion was based on information provided by Enbridge, which included (1) Enbridge's responses to Staff data requests ENG 1.69 and 1.70, which dealt with Enbridge's reaction and response to the National Transportation Safety Board's ("NTSB") report on the Company's Marshall, MI spill in 2010; (2) Enbridge's response to ten data requests of Intervenor Holder that addressed safety related issues; and (3) Enbridge witness Jerrid Anderson's answers to Mr. Maple's concerns and why Mr. Anderson believes Enbridge is fit, willing, and able to construct and operate the proposed pipeline. (ICC Staff Ex. 3.0, at 2)

Mr. Maple stated that "after taking into account this new information, along with several new data request responses from the Company and discussions I have had with federal regulators, I believe that, subject to condition, Enbridge is fit, willing, and able to construct and operate the proposed pipeline." (ICC Staff Ex. 3.0, at 2) Mr. Maple recommends that "the Commission grant Enbridge a certificate in good standing... on the condition that Enbridge must implement all of the upgrades and changes that Mr. Anderson lists on pages 15-17 of his rebuttal testimony, and must do so before it begins operating the proposed pipeline." (ICC Staff Ex. 3.0, at 2-3)

With respect to the likelihood of a leak in the Flanagan South Pipeline similar in scope to the Marshall, Michigan release, Mr. Maple stated that based on Mr. Anderson's explanation of how several of the recent problems can be attributed to inferior construction methods that the industry and Enbridge no longer utilize today, and his own conversations with an inspector at PHMSA that seem to confirm Mr. Anderson's assertion, "[w]hile a leak is always possible on any pipeline, I believe the likelihood of a

leak on the proposed pipeline is lessened due to the improved construction methods and safety techniques that Enbridge will employ on this project." (ICC Staff Ex. 3.0, at 3)  He disagreed with Mr. Anderson's contention that a severe leak would not be a "disaster" for landowners, contending that such a leak would be a disaster "even if Enbridge is willing to clean the land and make payments to the landowners, as it did in Marshall, Michigan."  As he stated, "No fair market relocation payment can change the fact this is an unwanted disaster for those families."  He further asserted that "there is no guarantee that Enbridge will offer a similar buyback program for the next leak, especially if it is less severe in nature." (ICC Staff Ex. 3.0, at 4)

Importantly, however, Mr. Maple expressed his belief that Enbridge had learned from the recent leaks and improved its processes and procedures.  As Mr. Maple stated:

> "It is unfortunate that it took these releases to bring about improvements.  Nevertheless, as a result of the releases I referenced in my direct testimony, the NTSB, PHMSA, and its own management have all scrutinized Enbridge's operations.  In response to the NTSB investigation, Enbridge changed or committed to change a number of policies and procedures relating to pipeline integrity, leak detection, pipeline control, and operations. (Enbridge Ex. 7, pp. 15-17) Enbridge has also paid fines and made similar commitments to improve its operations as a result of PHMSA's investigation.  Because of all the attention that Enbridge and the Federal investigators have given to uncovering the causes of the Marshall, MI spill and fixing those issues, I do believe that Enbridge will be a safer operator going forward."

(ICC Staff Ex. 3.0, at 5)

In short, Mr. Maple takes the position that the changes proposed by Enbridge are adequate to conclude that Enbridge is fit, willing, and able to construct and build the proposed pipeline.  (ICC Staff Ex. 3.0, at 5)  However, he requested that the Commission order Enbridge to file a quarterly report with the Director of the Safety and Reliability Division of the Illinois Commerce Commission that gives the status of the pipeline construction project and also an update of the Company's response to ENG 1.74, giving the status of each action item.  He recommended that these quarterly reports continue until Enbridge has finished constructing the Illinois portion of the pipeline and has completed all of the action items in Mr. Anderson's rebuttal testimony. (ICC Staff Ex. 3.0, at 6)

### D.    Commission Analysis and Conclusion

Enbridge presented evidence intended to show that it is "fit, willing, and able to provide the service in compliance with this Act, Commission regulations and orders" within the meaning of Section 15-401(b) of the Act. Intervenor Virginia Holder appeared to suggest otherwise, but never formally stated an opinion, nor presented any supporting evidence, and the Commission agrees with Staff that her concerns that Enbridge FSP is not fit, willing, and able are adequately addressed in Enbridge's answers to her data requests. Staff's position originally was that Enbridge is not fit to construct and maintain the proposed pipeline, because of concerns about Enbridge's ability to safely construct and operate the pipeline. However, based on testimony and additional information supplied by Enbridge, including Enbridge's responses to Staff data requests ENG 1.69 and 1.70, Staff changed its initial position and found that Enbridge is fit, willing, and able to construct and maintain the proposed pipeline, subject to conditions. The positions of the parties are set forth in their briefs and are summarized above, and will not be repeated in detail here.

The Commission has reviewed the record on this issue. While the incidents in Romeoville, Illinois, Grand Marsh, Wisconsin, and Marshall, Michigan do not reflect favorably on Enbridge, the record on the whole indicates that Enbridge FSP is fit, willing, and able to construct and operate the pipeline within the meaning of Section 15-401(b). In reaching this conclusion, the Commission is persuaded by the analysis and conclusions presented by Staff, whose position is supported by the testimony of two Staff witnesses, both experts.

In this regard, Staff witness Ms. Freetly, a Senior Financial Analyst, testified that Enbridge FSP, through its relationship with Enbridge, has the financial capability to construct, operate and maintain the proposed pipeline from near Pontiac, Illinois to the Illinois/Missouri border near Quincy, Illinois, and to collocate seven pump stations with existing facilities. (ICC Staff Ex. 2.0, at 1-2) In support of her opinion, Ms. Freetly described in detail the analysis she performed, and the bases for her conclusions. She also noted that Enbridge operates the world's longest crude oil and liquids pipeline system in Canada and the United States.

Also in this regard, Staff witness Mr. Maple, an experienced engineer, agreed that the Application was properly filed, that Enbridge had demonstrated a public need for the pipeline and the common-carrier-by-pipeline services it will provide, and that the public convenience and necessity is served by Enbridge's right-of-way acquisition program and procedures and by the route Enbridge has selected for the new pipeline. (ICC Staff Ex.1.0, at 5-13) Moreover, although initially he also took the position that Enbridge had failed to demonstrate it was fit, willing, and able to construct and operate the proposed pipeline due to concerns he had about Enbridge's ability to safely construct and operate the pipeline (ICC Staff Ex. 1.0, at 18), in his Rebuttal Testimony Mr. Maple revised his view in this regard, based on Enbridge's response to relevant data requests, and Mr. Anderson's answers to Mr. Maple's concerns, particularly as to why the conditions and problems that accompanied the releases in Marshall, Michigan, Grand Marsh, Wisconsin, and Romeoville, Illinois were highly unlikely to occur

anywhere on the Flanagan South Pipeline. (ICC Staff Ex.3.0, at 2-3) Mr. Maple also had conversations with a PHMSA inspector that seemed to confirm the validity of Mr. Anderson's responses. (ICC Staff Ex. 3.0, at 3) The Commission likewise finds Mr. Maple's analysis, and Mr. Anderson's answers, persuasive.

The Commission observes that no similar but contrary analyses were performed by any other parties.

As a condition of this Order, Enbridge shall fulfill its commitments to provide such financial support as is reasonably necessary for the construction and operation of the proposed pipeline, as described in the record, and Enbridge FSP, shall fulfill its commitments to obtain such financial support from Enbridge.

In addition, as a condition of this Order, Enbridge must implement all of the upgrades and changes listed on pages 18-20 of this Order as taken from pages 15-17 of Mr. Anderson's Rebuttal Testimony, Enbridge Ex. 7, and must do so before it begins operating the proposed pipeline. As a further condition of this Order, Enbridge must filed a quarterly report with the director of the Safety and Reliability Division of the Commission that gives the status of the pipeline construction project and also an update of Enbridge's response to ENG 1.79, giving the status of each action item. These quarterly reports are to continue until Enbridge has finished constructing the Illinois portion of the pipeline and has completed all of the action items on pages 15-17 of Mr. Anderson's Rebuttal Testimony, Enbridge Ex. 7.

## V.    PUBLIC NEED/PUBLIC CONVENIENCE AND NECESSITY

### A.    Public Need/Public Convenience and Necessity Issues Other Than Routing

#### 1.    Enbridge FSP's Position

As recognized by the Commission in Docket No. 06-0470 and Docket No. 07-0446, adequate supplies of petroleum and refined petroleum products are essential to the public and the economic health and well-being of Illinois, the Midwest, and the nation. Applicant points out that at one time, the United States led the world in the discovery and production of crude oil. Such, however, has not been the case for many decades and as domestic supply dwindled in various regions, many areas of the nation became dependent on imported crude to provide the means of furnishing the gasolines, fuel oils, asphalts, heating oils and lubricants, and industrial feedstocks that the consuming public needs and demands and which fuel the national economy. Despite new discoveries, over time growth in demand necessitated that a growing percentage of the country's crude oil supply be imported, often from regions and sources not necessarily friendly to the nation or particularly stable and secure from natural disasters and disruptions. Many parts of the continental United States, such as Illinois, which produces less than four percent (4%) of its crude oil requirements, are almost totally dependent on crude oil imports from other U.S. regions or foreign suppliers. In PADD II, which comprises Midwestern states, including Illinois, and Mid-Continent

12-0347

states, only 24% of crude oil demand is satisfied by PADD II supply sources and in PADD III, which includes the U.S. Gulf Coast region, just 44% of crude oil demand is met by native PADD III production sources.  (Application at 16-17)

Applicant states that although PADD II consumers of petroleum products are thus dependent on non-local sources of crude oil, they are in fact far less vulnerable than other U.S. regions to supply shortages and price volatility because in recent decades western Canadian crude oil transported by Enbridge and other pipeline systems (facilitated by decisions of this Commission) has become a major component of PADD II refiners' supply slates, constituting in 2011 approximately 44% of the crude oil consumed in the region.  (Application at 17)  Indeed, in 2011, the northern portion of the region, which contains the major refining complexes of the Chicago/Northern Indiana area, received almost all of its crude oil imports from Canada.  (Application at 17)  Consequently, this market area, which as recently as the 1990s got a substantial part of its crude oil supply from offshore imports landed in the U.S. Gulf and shipped north, now imports almost none of its needs from non-U.S./non-Canadian offshore sources.  Conversely, PADD III, which encompasses the Texas inland and Gulf Coast refining complexes, received in 2011 about 50% of its crude oil supply via waterborne imports from outside North America (if waterborne imports from Mexico are considered, this rises to 64%).  (Application at 17)  Applicant avers that waterborne imports from unstable, non-secure, and potentially hostile supply sources has historically exposed the nation's petroleum refiners and consumers to market shocks and disruptions detrimental to U.S. economic health and national security.  And Applicant argues that because of the high degree of concentration of refining-capacity in PADD III, with the resulting reliance on a web of refined-product pipelines for distribution purposes, as well as the fungible nature of refined products, regional supply disruptions and shortages can and do create nationwide adverse price impacts as well as supply failures. (Application at 17-18)  Inasmuch as PADD II overall lacks sufficient refining capacity to meet consumer demand, the region, including Illinois, receives significant volumes of refined products via pipelines from the Gulf Coast, the refining capacity of which greatly exceeds local demand for refined products.  Applicant states that while precisely tracking such movements is difficult, there can be no doubt that preserving and enhancing the flow of Gulf Coast-produced gasolines and other fuels into the Midwest is critical to the region's economy and productivity.  (Application at 18)  Thus, Applicant says that for Illinois and the Midwest, there is a compelling need for stable and reliable sources of crude oil and its necessary transport facilities to and from the Gulf Coast as well as for the Midwest itself.  (Application at 18)

At the instigation of Enbridge and others, this Commission has repeatedly recognized that the crude oil resources of western Canada afford Illinois and much of the United States a desirable, stable, secure and economic alternative to traditional foreign, off-shore crude oil sources.  (Application at 18)  The increasing availability of Canadian-sourced crude oil in the last two decades has led to shifts in demand patterns and supply-slate preferences by refiners that required increased pipeline capacity to satisfy the need and demand for Canadian crude oils.   Recognition of these developments and their potential benefit to the public in Illinois and throughout PADD II

22

caused this Commission to approve several major pipeline expansions and additions. (Application at 18)    Moreover, more recent developments in the United States, particularly the rapid growth of crude production in the Williston Basin resulting from increased exploration and improved production techniques, have in the last few years created a new and significant source of domestic crude that needs market access. International and interstate pipelines, such as those built and operated by Enbridge, are the most practical means of meeting the needs of Illinois and the nation for long-distance transportation of increased supplies of western Canadian and domestic crude oil.  (Application at 18-19)

The importance of expanding and extending the nation's pipeline infrastructure has been expressly recognized and encouraged by the federal government as a national priority.  (Application at 19)  The President recently declared in a Presidential Memorandum dated March 22, 2012, concerning the review of domestic pipeline infrastructure projects (www.whitehouse.gov/the-press-office/2012/03/22/presidential memorandum) that:

> ". . . for the foreseeable future, we will continue to rely on oil to help fuel our transportation system.  As a result, we must safely and responsibly develop our oil resources here at home. . . .
>
> * * *
>
> In order to realize these potential benefits, we need an energy infrastructure system that can keep pace with advances in production.  To promote American energy sources, we must not only extract oil – we must also be able to transport it to our world-class refineries, and ultimately to consumers.
>
> The need for infrastructure is particularly acute right now.  Because of advances in drilling technology . . . rising production is outpacing the capacity of pipelines to deliver the oil to refineries.
>
> * * *
>
> Although expanding and modernizing our nation's pipeline infrastructure will not lower prices right away, it is a vital part of a sustained strategy to continue to reduce our reliance on foreign oil and enhance our nation's energy security.  Therefore . . . we must make pipeline infrastructure a priority [while ensuring health, safety, and the environment] while supporting projects that can contribute to economic growth and a secure energy future."

(Application at 19)

To these ends, an "Executive Order on Improving Performance of Federal Permitting and Review of Infrastructure Projects" was issued concurrently with the

12-0347

Presidential Memorandum concerning the federal permitting and review process (Fact Sheet: "Obama Administration Commitment To American Made Energy," www.whitehouse.gov/the-press-office/2012/03/21/fact-sheet). As stated therein, "the need for pipeline infrastructure is urgent" and "[e]xpanding and modernizing our nation's crude oil and refined products pipeline infrastructure is a vital part of a sustained strategy to continue to reduce our reliance on foreign oil and enhance our nation's energy security," to which ends "it is critical that we make pipeline infrastructure a top priority." (Application at 19-20)

The "world-class refineries" requiring enhanced pipeline infrastructure include those in the U.S. Gulf Coast that will be reached by the new and enhanced transport capacities of Enbridge's Flanagan South Pipeline and the Seaway Pipeline projects. Within the scope of these interconnected lines on the Gulf Coast will be some thirteen (13) major, modern refineries with a total capacity to process and refine 3.5 million bpd of crude oil, including the full range of crude types produced in western Canada and in the Williston Basin. The Flanagan South Pipeline will initially be able to transport about 600,000 bpd to the Cushing Hub for continued transportation on the Seaway Pipeline, which, when fully operational, will have the capacity to transport 850,000 bpd to the Gulf Coast (Seaway currently terminates in the Houston area; a planned 85-mile extension will allow movements on to the Port Arthur/Beaumont, Texas refining complex). The output of these "world-class refineries" will, in turn Applicant notes, be available to consumers in much of the nation, including those in Illinois, via the existing system of refined-product pipelines. (Application at 20)

Applicant states that because Illinois consumers require, according to the most recent (2010) data, over 27.0 million gallons per day of refined petroleum products, including over 13.5 million gallons per day of gasoline, enhancing the nation's capacity to supply such products from diverse sources, such as the Gulf Coast refineries, can only contribute to energy security and consumer satisfaction in Illinois. Demand in Illinois for petroleum and petroleum products for transportation, industrial, and home use has grown continuously since the mid-1990s, despite economic problems, and remains strong, despite alternative-energy developments, as the Presidential Memorandum recognizes. Applicant contends that as well as being a major industrial and agricultural producer, Illinois is a significant participant in the national economy and can only benefit from economic growth and development across the nation facilitated by the provision of economic and secure supplies of crude oil for the country's most substantial refining region. (Application at 21)

Also, the Flanagan South Pipeline Project, when completed, will help meet the need for stable and reliable sources of oil as well as providing additional benefits to Illinois and the nation. (Application at 21)  Jerrid Anderson, testifying for Applicant, contends that "the market response to our FSP Project demonstrates that our planned facilities are needed and will be used and useful in satisfying the public need for petroleum products. Prior to committing irrevocably to building a 36-inch line, Enbridge conducted what is referred to in the industry as an "open-season to solicit expressions of interest in and support of the use of the proposed transport capacity by producers

24

and shippers of crude petroleum." Actually, Mr. Anderson states, Enbridge "conducted several such tests of market support," and "[t]he response was so substantial that it warranted the multi-billion dollar investment required for the FSP Project." (Enbridge Ex. 1, at 5-6)

Applicant states that the Flanagan South Pipeline Project will increase the likelihood of consumers paying less for the petroleum products they use when there are supply interruptions because the additional oil brought to world markets using the new pipeline will add to the industry's transport capacity. Traditionally, the oil industry produces what it needs and holds little inventory; thus the ability to bring on line available capacity is a very important determinant of the extent of upward-price pressures related to unexpected supply interruptions. Applicant says that additional oil supply made available via the Flanagan South Pipeline will provide an incremental insurance cushion to help diminish price volatility in situations of supply uncertainty. As well, the Flanagan South Pipeline Project will enhance national security in that it represents an important step toward reducing the nation's reliance on Middle Eastern, African, and South American crude oil by increasing access to energy from our own nation and our close ally Canada. Such greater energy security is vitally important: Iran and Venezuela, for example, have both threatened, and have the capability, to choke-off supplies of oil to the United States, thereby threatening the U.S. economy and national security. In addition, Enbridge's Flanagan South Project will benefit the economies of both the United States and of Canada. The benefits of a growing U.S. economy are obvious. However, a strong Canadian economy also benefits Illinois and the United States. When Canada's economy grows, so does its consumption of goods and services imported from the United States. Further, as Canada's economy grows, its investments in the United States also grow. (Application at 21-22)

Dr. Charles J. Cicchetti of the Pacific Economics Group supports many of these points. He testifies that in North America, a lack of pipeline transportation in the center of the U.S. to move crude to refinery hubs such as those along the U.S. Gulf of Mexico is "a major bottleneck." (Enbridge Ex. 3, at 14) He argues that the Flanagan South Pipeline would help remove this bottleneck with the result that a greater volume of crude deliveries would be moved to the Gulf region. He argues that "[t]his will mean expected lower future petroleum prices and less price volatility, all else the same." (Enbridge Ex. 3, at 25) In addition, he argues there are important secondary benefits: "These include using Canadian oil to back off less dependable imports to the Gulf, primarily from Venezuela and the Persian Gulf. In addition, both increased U.S. production from the Plains States and Alberta mean that the dollars spent on crude oil mostly remain in the United States. This increases economic activity in both the U.S. and Canada and expands employment." (Enbridge Ex. 3, at 26)

The Midwest and Illinois share in these gains from trade and economic interdependence. Applicant states that currently, the volume of trade between Illinois and Canada exceeds $50 billion, and is growing. Applicant contends that should the Illinois economy slow, the importance of increased Canadian business and economic investments cannot be underestimated. Increasing Canadian exports, including crude

oil, contribute to Canadian personal incomes and make it likely Canada will import more goods and services from the United States. This is a public use benefit for Illinois whether the increased imports are used in refineries in Illinois, the Midwest, or the U.S. Gulf Coast. Furthermore, Applicant states, construction of the Flanagan South Pipeline will bring jobs to Illinois. (Application at 22) John C. Felmy, Chief Economist for the American Petroleum Institute, testifies that "[g]iven the almost billion-dollar level of investment Enbridge will make in Illinois to install the new pipeline and pump stations, it is reasonable to expect that numerous construction-related jobs will be created in Illinois by the project and that local economies along the pipeline route will see substantial spin-off expenditure during the construction process." (Enbridge Ex. 6, at 5) Mr. Felmy further argues that looking at the issue of economic benefit to Illinois more broadly, the long-term increase in economic activity generated by the development of western Canadian and domestic – i.e., Williston Basin – oil resources redound to Illinois utilities, such as Caterpillar, that supply goods and services to the petroleum-production market. (Enbridge Ex.6, at 5)

The expected amount of investment allocable to Illinois from development and construction of the Flanagan South Pipeline is $901 million. It is anticipated that over 1,200 directly related construction jobs will be created in Illinois when line installation peaks. Additional ancillary economic benefits are also anticipated. (Application at 22)

Dr. Cicchetti calculates that the expected present value of the benefits to Illinois made possible by the Flanagan South Pipeline would be about $3.45 billion in 2009 dollars over the period through 2035. (Enbridge Ex. 3, at 68) He calculates that the present value of the benefits to the entire PADD II region made possible by the pipeline would be about $25.26 billion over the period through 2035. (Enbridge Ex. 3, at 72)

It has sometimes been suggested that these types of economic benefits to Illinois may not occur because, the argument goes, the crude oil to be carried by the Flanagan South Pipeline will somehow be "diverted" or intended for export. Mr. Felmy, testifying for Applicant, says that such arguments "have no basis in fact." (Enbridge Ex. 6, at 5) He testifies that "[v]ery little crude oil is exported from the United States; only about a 0.3% of gross supply was exported in 2011." (Enbridge Ex. 6, at 6) And while it is true that refined products are exported, he contends that "such transactions do not and will not impair domestic supplies and in fact they contribute to the overall growth and well-being of the U.S. economy." (Enbridge Ex. 6, at 6)

Dr. Cicchetti contends that in addition to the expected value of consumers' savings over time, the Flanagan South Pipeline will provide national security, balance of payments and job benefits. (Enbridge Ex. 3, at 73) He states that when more oil flows into the U.S. from Canada, "the crude flow is more secure and comes from a stable, environmentally progressive, and friendly neighbor" and that, in addition, "Canada's increased petroleum dollars are more likely to be spent on U.S. goods and services than when the U.S. purchases oil from other nations." (Enbridge Ex. 3, at 74)

Dr. Cicchetti also contends that given the slow and uncertain economic recovery, "the Commission should be cognizant of the jobs that Flanagan South would cause and induce." (Enbridge Ex. 3, at 82) He testifies that "[f]or each $1 million invested in Pipeline Transportation in Illinois, there would be 7.9613 new direct and indirect jobs." (Enbridge Ex. 3, at 82) He estimates that the investment in the Flanagan South Pipeline would be equivalent to about $2.74 billion in 2008 U.S. dollars. (Enbridge Ex. 3, at 82) Thus, he states, "[w]ith an investment of $2.74 billion in 2008 USD, there would be 21,834 jobs spread over several years." (Enbridge Ex. 3, at 82) In addition to these direct and indirect jobs, he states there would also be induced employment benefits because much of the new earnings from the direct and indirect jobs will be spent. Thus, he calculates that "the combined direct, indirect, and induced job increase would be about 34,289 across the state, region and nation." (Enbridge Ex. 3, at 83)

Finally, Applicant says that in addition to its economic contributions, Enbridge's Flanagan South Pipeline will meet the public need for increased supplies of western Canadian and Williston Basin crude oil in a manner conducive to the public convenience and necessity. In particular, any environmental impacts will be minimized. This is partly due to the fact that building the new pipeline generally along Spearhead Pipeline route and using its existing facility rights-of-way will minimize any potential adverse economic effects. (Application at 23) Likewise, Enbridge's decision to collocate the requisite new pumping capacity facilities with the existing Spearhead stations reduces the need for new greenfield locations and reduces the line's overall footprint within Illinois. (Application at 23)

Stephen G. Brick is a Senior Fellow-Climate and Energy, Chicago Council In Global Affairs. He points out that because the Flanagan South Project would, in part, be used to transport oil produced from Albertan oil sands to U.S. refineries, historically some have suggested that if a pipeline project such as this is stopped, petroleum production from the oil sands will be reduced or stopped. He testifies that the idea that the production can somehow be stopped in this way "is not realistic, and scenarios that posit this are not [a] reasonable foundation for policy decisions." (Enbridge Ex. 5, at 10) Mr. Brick contends that so-called secondary environmental impacts, such as the upstream effects of producing the crude to be shipped in the pipeline, "are likely to occur whether or not the new pipeline is built – that is, petroleum production in western Canada and the Williston Basin will continue to increase and find its way to world markets whether or not the new pipeline is built." (Enbridge Ex. 5, at 11) In addition, Mr. Brick points out that "Canadian environmental regulatory and monitoring practices are among the best in the world." (Enbridge Ex. 5, at 13) The bottom line, he argues, is that "the project is in the interest of the people of the State of Illinois and in the national interest." (Enbridge Ex. 5, at 3)

2.    **Staff's Position**

Staff witness Mark Maple concurs that the Application was properly filed, and that Enbridge has demonstrated a public need for the pipeline. (ICC Staff Ex. 1.0, at 5) In support of his conclusion that there is a public need for the pipeline, Mr. Maple points out that Enbridge has received contractual commitments from 14 shippers for terms

ranging from 10-20 years for volumes in excess of 500,000 barrels per day for a pipeline that will have an initial capacity of 600,000 barrels per day, meaning that a large majority of the capacity is already subscribed.  (ICC Staff Ex. 1.0, at 5-6)  Mr. Maple also cites the testimonies of Dr. Cicchetti and Dr. Felmy, Chief Economist of the American Petroleum Institute, as other examples that demonstrate demand for the pipeline.  (ICC Staff Ex. 1.0, at 6)

Mr. Maple's opinion that there is a public need for the pipeline is based on an examination of the needs of the general public, not just the needs of a few individuals or private entities.  (ICC Staff Ex. 1.0, at 6)  His opinion is that the increased crude oil supply should help to serve the needs of the general public in Illinois and throughout the country for crude oil products, including gasoline, diesel fuel, jet fuel, and asphalt.  (ICC Staff Ex. 1.0, at 6-7)  He concludes that the commitments that Enbridge has secured from shippers on the proposed pipeline are an indication of the demand in the Midwest and the Gulf Coast regions for Canadian crude.  He further concludes that getting Canadian crude to the Cushing hub can help satisfy demand in other regions of the country beyond Oklahoma and the Midwest.  Mr. Maple points out that "This is important, because energy demand in the U.S., and demand for petroleum products, is forecast to rise slightly in the coming decades."  (ICC Staff Ex. 1.0, at 7)  He further points out that "Roughly half of the petroleum products used in the U.S. are refined in the Gulf Coast region, which this pipeline will help to serve.  (ICC Staff Ex. 1.0, at 7)

Mr. Maple also concludes that the public convenience and necessity will be served by the proposed pipeline.  With respect to whether the proposed pipeline will provide any conveniences to the Illinois public, Mr. Maple states that "[t]his proposed pipeline would serve the public by helping to ensure a reliable supply of refined products and may help to mitigate high gasoline prices in the region."  (ICC Staff Ex. 1.0, at 9) He further states that "[a]t the very least, it may minimize price spikes that occur when maintenance, leaks, or other issues remove other pipelines from service because it would increase the amount of alternate sources of supplies feeding the region."  (ICC Staff Ex. 1.0, at 9)

Mr. Maple expresses his opinion that the proposed pipeline will bring other benefits to Illinois besides economic benefits.  The Flanagan South Pipeline will move Canadian sourced petroleum down to Cushing, Oklahoma, a major hub for shippers that is in close proximity to the Gulf Coast region, which has substantial refining capabilities. This is a benefit to Illinois, because "Illinois is a net importer of refined products, so we rely on areas such as the Gulf Coast region to supply our demand for gasoline and other products."  (ICC Staff Ex. 1.0, at 10)  Mr. Maple argues that "[w]hen more pipeline capacity is built to these refining regions, it eliminates bottlenecks, increases supply competition, and creates a more reliable network that ultimately should provide Illinois with more secure, steadily available refined products priced closer to other regions of the country."  (ICC Staff Ex. 1.0, at 10)

Finally, Mr. Maple contends that the pipeline should help lower the dependence of the country and the Gulf Coast refineries on foreign oil.  Bringing Canadian crude to

the Gulf Coast refining region "would provide our nation with additional crude oil supplies from a friendly and reliable country," and bringing crude produced in North Dakota to the Gulf Coast refining region "improves our nation's economy and reduces foreign imports as well." (ICC Staff Ex. 1.0, at 10)

### 3. Commission Analysis and Conclusion on Public Need/Public Convenience and Necessity Other Than Routing

Both the Applicant and Staff agree that the proposed pipeline will serve both a public need and the public convenience and necessity. As discussed above, Appellant presented considerable evidence tending to show that the requisite standards were met. Staff examined this evidence in detail, conducted its own analyses, and concluded that the Commission should issue a certificate authorizing Enbridge FSP to operate as a common carrier by pipeline.

Staff witness Mr. Maple found that Applicant had demonstrated a public need for the pipeline. First, he found that shippers were plainly interested in using the proposed pipeline, as Enbridge has received contractual commitments from 14 shippers for terms ranging from 10-20 years for volumes in excess of 500,000 barrels per day. (ICC Staff Ex. 1.0, at 5) Second, he did not dispute Mr. Cicchetti's conclusion that Enbridge's proposed pipeline would help remove the bottleneck in getting supply to market in North America. Third, he concluded that the increased crude oil supply should help to serve the needs of the general public in Illinois and throughout the country for crude oil products. As he stated:

> I believe that the commitments that Enbridge has secured from shippers on the proposed pipeline are an indication of the demand in the Midwest and the Gulf Coast regions for Canadian crude. If shippers are interested in bringing in supplies, there must be a market willing to take those increased supplies. Getting Canadian crude to the Cushing hub also means that it can help satisfy demand in other regions of the country beyond Oklahoma and the Midwest. This is important, because energy demand in the U.S., and demand for petroleum products, is forecast to rise slightly in the coming decades. (U.S. Energy Information Administration, Annual Energy Outlook 2012) Roughly half of the petroleum products used in the U.S. are refined in the Gulf Coast region, which this pipeline will help to serve. (U.S. Energy Information Administration, Petroleum Supply Annual, Volume 1) Because of these reasons, I believe that this pipeline will be used and not sit idle if it is built.

(ICC Staff Ex. 1.0, at7)

Staff witness Mr. Maple also found that Applicant had demonstrated that the pipeline would serve the public convenience and necessity. (ICC Staff Ex. 1.0, at 8-10; ICC Staff Ex. 3.0, at 2) With respect to the public convenience and necessity, the

12-0347

Commission must consider a number of factors listed in Section 15-401(b) (220 ILCS 5/15-401(6), including any evidence presented by the Illinois Environmental Protection Agency regarding the environmental impact of the proposed pipeline or facility, any evidence presented by the Illinois Department of Transportation regarding the impact of the proposed pipeline or facility on traffic safety, road construction, or other transportation issues, and any evidence presented by the Department of Natural Resources regarding the impact of the proposed pipeline or facility any conservation areas, forest preserves, wildlife preserves, wetlands, or any other natural resource.

None of those Departments or agencies submitted any evidence or reports regarding the proposed pipeline and facilities.  (ICC Staff Ex. 1.0, at 8)  However, in response to Staff data request ENG 1.45, the Company did provide the National Transportation Safety Board Accident Report, dated July 10, 2012, on the Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release in Marshall, Michigan on July 25, 2010.  (ICC Staff Ex. 1.0, at 8-9)

Staff found that the proposed pipeline will provide conveniences to the Illinois public.  Staff witness Mr. Maple found as follows:

> As noted earlier, there is a strong demand in Illinois and the surrounding area for both crude petroleum and the resulting products such as gasoline.  This proposed pipeline would serve the public by helping to ensure a reliable supply of refined products and may help to mitigate high gasoline prices in the region.  At the very least, it may minimize price spikes that occur when maintenance, leaks, or other issues remove other pipelines from service because it would increase the amount of alternate sources of supplies feeding the region.

(ICC Staff Ex. 1.0, at 9)

Staff also found that there were benefits to Illinois from the proposed pipeline and facilities besides economic benefits.  In this regard, Mr. Maple concluded:

> The Flanagan South Pipeline will move Canadian sourced petroleum down to Cushing, Oklahoma, which is a major hub for shippers.  This hub is also in close proximity to the Gulf Coast region, which has substantial refining capabilities.  Illinois is a net importer of refined products, so we rely on areas such as the Gulf Coast region to supply our demand for gasoline and other products (Enbridge Ex. 1, p. 6).  When more pipeline capacity is built to these refining regions, it eliminates bottlenecks, increases supply competition, and creates a more reliable network that ultimately should provide Illinois with more secure, steadily available refined products priced closer to other regions of the country.
>
> Additionally, bringing Canadian crude to the Gulf Coast refining region would provide our nation with additional crude oil supplies

30

from a friendly and reliable country. This can help offset potential imports from less friendly countries in politically unstable regions. Also, crude produced in North Dakota will be able to use the proposed pipeline to reach Cushing and the Gulf Coast refining region. (ENG 1.60) Relying more on U.S. sourced crude improves our nation's economy and reduces foreign imports as well. According to Enbridge witness Mr. Earnest, the Gulf Coast region constitutes about 50% of the country's refining capacity, and that region gets about two-thirds of its crude oil from foreign imports. (Enbridge Ex. 4, p. 13)  This pipeline should help lower that dependency on overseas oil.

(ICC Staff Ex. 1.0, at 9-10)

Based on the record, the Commission finds that a public need for the proposed service exists and that the public convenience and necessity require issuance of a certificate authorizing Enbridge FSP to operate as a common carrier by pipeline. Given these and other findings in this order, the Commission concludes that a certificate of good standing should be issued to the Applicant.

**B.    Location and Routing-Related Issues**

1.    **Enbridge FSP's Position**

The Flanagan South Pipeline will consist of approximately 600 miles, beginning at the Enbridge Flanagan terminal and tank facility in Livingston County, Illinois and extending generally in a southwesterly direction to end at the existing Enbridge terminal near Cushing, Oklahoma in Lincoln County.  Of the entire project, approximately 168 miles of the route will be located in the State of Illinois. (Application at 1)

Douglas B. Aller, the Land and Right-of-Way Manager, explains that in developing the plans for the Flanagan South Pipeline Project, Enbridge examined at least seven possible routes.  He stated that the so-called "System" alternatives included potentially utilizing the route authorized in Docket 07-0446 for the South Access Extension Pipeline from the Flanagan Terminal to the Patoka Hub, building a new pipeline from Patoka to the Wood River area, and then connecting to our Ozark Pipeline, which would have been reversed to move oil to Cushing.  Another possibility considered was to construct a new pipeline initially paralleling the Spearhead Pipeline and using its route for some distance before turning south to run to Wood River and then connect to the Ozark Pipeline.  The third general approach evaluated was to do what Enbridge in fact did in its Application – build a new pipeline along the Spearhead route.  Mr. Aller explained this alternative was selected because the other possibilities each had significant drawbacks.  (Enbridge Ex. 2, at 4-5)  By contrast, the route selected, by maximizing the utilization of existing rights-of-ways by generally following the Spearhead Pipeline route except for deviation to avoid new development or unusually sensitive environmental areas, minimizes the utilization of new routing, is predominately located in rural areas used for agricultural purposes, is generally away

from residential, commercial and industrial areas, and is the most publicly effective and convenient way to provide the needed transportation service and capacity. (Enbridge Ex. 2, at 6) Further, Mr. Aller explained that as a result of meetings with state, county, and municipal officials and agencies, and with numerous landowners, Enbridge made a number of significant and numerous minor refinements and adjustments to the route plan to avoid proposed subdivisions and to adjust to local conditions. (Enbridge Ex. 2, at 7)

Over 90% of the path of the Flanagan South Pipeline in Illinois parallels the Spearhead route. (Application at 14) The longest deviation from the Spearhead route will be near Quincy, Illinois, where the route will change for about five to six miles to bypass congestion on the Spearhead route at Quincy. The great majority of the Spearhead right-of-way is comprised of tracts whose easements grant Enbridge multiple-line rights in the property, for which reason, Applicant says, collocation of the Flanagan South and Spearhead pipelines is the most effective, least burdensome method of routing the new pipeline. Approximately 70% of the parcels to be crossed by the Flanagan South Pipeline are pre-existing Spearhead tracts with multiple-line rights. The new pipe will be generally installed at a 50-foot offset from the center line of the Spearhead Pipeline to ensure adequate space for safe construction and on-going maintenance activities. Applicant states that such collocation of these lines means routing-related issues will be minimized. (Application at 14-15; 22-23) Consequently, the proposed route of the Flanagan South Pipeline is the most effective and convenient way to provide the needed transportation service and capacity. (Application at 23)

## 2. Dynegy Midwest Intervenor's Position

Byron Veech, employed by Dynegy Midwest Generation, LLC ("DMG") as the Production Manager at its Havana power station, filed direct testimony on Dynegy's behalf. Mr. Veech states that "[a]s changed by the direct testimony filed by Enbridge, DMG has no *current* issues with the Application." (DMG at 2.) He explains that although when originally filed, the Application listed parcels of land that included portions of Havana, and in particular parcels that contain a closed ash pond at the plant as within the pipeline route, "Enbridge's direct testimony and, in particular the testimony of Mr. Aller (Enbridge Ex. 2), revised the pipeline route and removed the parcels that impacted the plant," and "[t]hus, as currently envisioned, DMG has no issues with the Application or the project." (DMG at 1-2) In addition, Mr. Veech stated that if the line is re-routed to include parcels owned by DMG, DMG would not necessarily oppose the Application, but would request the ability to respond to any impacts caused by that re-routing. (*Id*. at 2)

## 3. Staff's Position

Staff witness Mr. Maple testifies that he reviewed the proposed pipeline route and does not believe there are any other routes that would be better for the project. (ICC Staff Ex. 1.0, at 11)

He first describes that he met with Enbridge representatives Douglas Aller, Ron Fuchs, David Seitz, Elizabeth Zeimer, Tom Bray and Sam Weaver to discuss the route selection for the proposed pipeline. He states that "[w]e viewed electronic aerial maps of the entire proposed route that showed every potential concern when constructing the pipeline, including wetlands, archeological sites, roads, buildings, elevation changes, and other items of concern" and "[f]or every place along the route where the proposed line deviates from paralleling the Spearhead line, the six Enbridge employees gave me a very detailed verbal and visual explanation as to why the changes were necessary and the best option." (ICC Staff Ex. 1.0, at 11)

Based on this review, Mr. Maple does not see any problems with Enbridge's proposed route. As he states:

> "the chosen route passes mainly through rural, undeveloped land and minimizes the impact on major roadways, high density population areas, and environmentally sensitive areas. Enbridge has redesigned its route in multiple instances to take landowner concerns into consideration, often at extra expense to the Company. Virtually the entire route closely mirrors the existing Spearhead pipeline, which allows them to share one large right-of-way as opposed to being spread out and crossing Illinois in two unique paths. I do not see any problems in the route that Enbridge has selected."

(ICC Staff Ex. 1.0, at 11-12).

Mr. Maple also explains why, in his opinion, he does not believe there are any routes that would be better for this project. He describes how Enbridge evaluated at least seven potential routes before selecting the route presented in this docket. As he points out, "[t]he fact that this pipeline will parallel the Spearhead line for most of the route makes it by far the most efficient route when considering its impact on landowners" and that "[w]hile there are sometimes multiple ways to reroute the pipeline, Enbridge had given careful thought to its options and chose the one that it believed was the best considering aspects of safety, operations, cost, and land impact." (ICC Staff Ex. 1.0, at 12-13) And even though Mr. Maple acknowledged that it may be necessary for Enbridge to make minor deviations as a result of conflict with certain landowner structures or personal or business uses of the land, "I currently have no reason to think there is a route that would be superior to the one selected by Enbridge." (ICC Staff Ex. 1.0, at 13)

Finally, Mr. Maple states that he considers Enbridge's negotiations with landowners as a factor when evaluating public convenience (ICC Staff Ex. 1.0, at 13-14), and provides reasons why he believes Enbridge has negotiated in good faith with landowners along the proposed route. He describes how, according to Enbridge's response to Staff data request ENG 1.33, Enbridge has made over 6163 contacts with the 631 landowners along the proposed route, for an average of ten contacts per person. In addition, he notes, the Company has received permission to survey about

33

96% of the properties, and also has participated in several meetings and open houses with local officials and landowners who may be affected by the project. (ICC Staff Ex. 1.0, at 14-15) As Mr. Maple stated, "I have seen several instances where Enbridge has lengthened the planned route of the pipeline at its own expense to navigate around a pond, a row of trees, or some other obstacle at the request of a landowner," and "[t]hese actions show that Enbridge is sensitive to the wishes of landowners and is negotiating in good faith. (ICC Staff Ex. 1.0, at 15)

4.    **Commission Analysis and Conclusion on Location and Routing-Related Issues**

Enbridge FSP proposes to install a new 36-inch (outside diameter) pipeline – the Flanagan South Pipeline – that will originate at Enbridge's existing Flanagan Station and Terminal Facility located north of Pontiac, Illinois in Livingston county, and extend in a southwest direction for approximately 600 miles, running generally adjacent to and parallel to Enbridge's Spearhead Pipeline for most of its route through Illinois, Missouri, Kansas and Oklahoma. The pipeline will extend for approximately 168 miles in Illinois and will traverse the counties of Livingston, Woodford, Tazewell, Mason, Fulton, Schuler, Brown and Adams before crossing the Illinois/Missouri border near Quincy, Illinois.

The Project will also include three pump stations in Illinois to be collocated with existing Spearhead pump stations at the Flanagan Terminal (milepost zero:5 pumps), at the Forest Pump Station in Mason County (milepost 76.30:4 pumps), and at the Quincy Station (milepost 162.50:4 pumps) in Adams County. At the Forest and Quincy Stations, Enbridge expects to acquire in fee approximately ten acres of additional space adjacent to each established site.

Exhibit D to the Application contains a legal description of the proposed pipeline. Exhibits A, B, and C to the Application are copies of maps showing the proposed pipeline route, with Attachment A showing the place of the Flanagan South Pipeline in the overall pipeline route from the Alberta oil sands to Houston; Attachment B showing the route of the Flanagan South Pipeline from the Flanagan Terminal in Illinois to the Cushing Terminal in Oklahoma, and Attachment C showing the route of the Flanagan South Pipeline solely in Illinois.

With regard to the location or routing of the proposed pipeline, Section 15-401(b) of the CCPL states in part:

> In its determination of public convenience and necessity for a proposed pipeline or facility designed or intended to transport crude oil and any alternate locations for such proposed pipeline or facility, the Commission shall consider, but not be limited to, the following:
>
> (1)    any evidence presented by the Illinois Environmental Protection Agency regarding the environmental impact of the proposed pipeline or other facility;

34

(2)  any evidence presented by the Illinois Department of Transportation regarding the impact of the proposed pipeline or facility on traffic safety, road construction, or other transportation issues;

(3)  any evidence presented by the Department of Natural Resources regarding the impact of the proposed pipeline or facility on any conservation areas, forest preserves, wildlife preserves, wetlands, or any other natural resource;

(4)  any evidence of the effect of the pipeline upon the economy, infrastructure, and public safety presented by local governmental units that will be affected by the proposed pipeline or facility;

(5)  any evidence of the effect of the pipeline upon property values presented by property owners who will be affected by the proposed pipeline or facility;

(6)  any evidence presented by the Department of Commerce and Economic Opportunity regarding the current and future economic effect of the proposed pipeline or facility including, but not limited to, property values, employment rates, and residential and business development; and

(7)  any evidence presented by any other State agency that participates in the proceeding.

(220 ILCS 5/15-401(b))

The right-of-way requirements for the Flanagan South Pipeline Project include a 50-foot wide permanent pipeline right-of-way and up to 85-feet of temporary work space area running from the Flanagan terminal through parts of Livingston, Woodford, Tazewell, Mason, Fulton, Schuler, Brown and Adams Counties in the State of Illinois. Also, extra temporary workspace areas beyond the typical size will be required in some locations, such as road crossings, railroad crossings, and wastelands and water body crossings.

Enbridge witness Douglas Aller describes how the route proposed for the new pipeline largely follows and employs that of Enbridge's Spearhead Pipeline. He notes that the great majority of the Spearhead right-of-way is comprised of tracts whose easements grant Enbridge multiple-line rights in the property and, accordingly, states that "collocation of the Flanagan South and Spearhead pipelines is the most effective, least burdensome method of routing the new pipeline." (Enbridge Ex. 2, at 3)

Staff witness Mark Maple testifies that he does not see any problems with Enbridge's proposed route and does not believe that there are any routes that would be better for this project. (ICC Staff Ex. 1.0, at 11-12) He reaches this conclusion after

meeting with six Enbridge representatives, including Douglas Aller, to discuss the route selection and also viewing period maps of the entire proposed route. He states that "[f]or every place along the route where the proposed line deviates from paralleling the Spearhead line, the six Enbridge employees gave me a very detailed verbal and visual explanation as to why the changes were necessary and the best option." (ICC Staff Ex. 1.0 at 11) He further describes how "[t]he chosen route passes namely through rural, undeveloped land and minimizes the impact on major roadways, high density population areas, and environmentally sensitive areas, and states that "Enbridge has redesigned its route in multiple instances to take landowner concerns into consideration, often at an extra expense to the Company." (ICC Staff Ex. 1.0, at 11)

Staff found that the route was chosen only after Enbridge evaluated at least seven potential routes. Staff believes that Enbridge has "given careful thought to its options and chose the one that it believed was the best considering aspects of safety, operations, cost, and land impact." (ICC Staff Ex. 1.0, at 13)

Further, Staff is of the opinion that Enbridge has negotiated in good faith with landowners, and describes in some detail the actions taken by Enbridge with respect to landowners that support this conclusion. (ICC Staff Ex. 1.0, at 14-15)

Intervenor Dynegy Midwest originally expressed concern about the route of the project because as originally filed, the Application listed parcels of land that included portions of DMG's Havana power station and in particular a closed ash pond at the plant. However Enbridge's revised pipeline route removes these parcels and therefore "as currently envisioned, DMG has no issues with the Application on the project." (DMG, at 1-2) No other party expressed an opinion as to the proposed route.

Based on the record of this proceeding and the other findings in this Order, the Commission finds that Enbridge FSP's proposed route for the pipeline is reasonable and it is hereby approved. As Staff notes, there were essentially no alternative routes or detailed alternative route segments proposed in this proceeding.

The Commission also agrees with Staff that due consideration in the route selection process was given to minimizing impacts on wetlands and other environmentally sensitive locations, cultural areas, the number of properties and landowners affected, major roadways and high density population areas.

The Commission also notes that no evidence was presented by any of the state agencies identified in Section 15-401(b). All other routing-related evidence contemplated under Section 15-401 has been duly considered by the Commission, to the extent presented, and such evidence does not support a finding that the proposed route should be rejected or that some alternate location is superior to the route approved herein.

12-0347

VI.  **SECTION 8-503 OF THE PUA**

Applicant also requests an order pursuant to Section 8-503 of the PUA.  That section provides in part as follows:

> Whenever the Commission . . . shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility . . . are necessary and ought reasonably to be made or that a new structure or structures is or are necessary and should be erected, to promote the security or convenience of its employees or the public, or in any other way to secure adequate service or facilities, the commission shall make and serve an authorizing or directing that such additions, extensions, repairs, improvements or changes be made, or such structure or structures be erected . . . .

Having reviewed the record, the Commission finds that the necessary showings under Section 8-503 have been made and that the proposed pipeline project should be authorized.  In addition, for the reasons discussed below, although the Commission believes that additional negotiations would be appropriate and should be conducted, if Applicant is unsuccessful in obtaining the land rights required to build the pipeline along the approved route, it should be authorized to exercise eminent domain authority.

VII.  **EMINENT DOMAIN**

A.  **Enbridge FSP's Position**

Applicant contends that the Commission should issue an Order under Section 8-509 of the Act authorizing Enbridge FSP to acquire property for the pipeline through the law of eminent domain when necessary. (Application at 30)  Applicant states that it has no desire or intention to condemn the permanent and temporary workspace easements and other interests in land it requires for the pipeline, preferring instead to acquire the needed rights through good faith negotiations with landowners.  Enbridge already owns rights-of-way along the majority of the route because of its ownership of the Spearhead System and will use that right-of-way as necessary to build the Flanagan South Pipeline.  Where necessary for the Flanagan South Pipeline, additional permanent easement space will be sought to allow for a fifty (50) foot centerline-to-centerline offset between the two pipes as is necessary to allow for safe construction, operation, and maintenance activities on the two pipelines.  Also, during construction, additional 85-foot temporary workspace easements will be needed alongside the permanent easement areas.  In addition, Enbridge is instituting for the Flanagan South Pipeline a land-acquisition program similar to those found adequate and acceptable in Docket Nos. 06-0470 and 07-0446 where such land acquisition is necessary. (Application at 30-31)

Based on Enbridge's past experience, it expects the need for condemnation to be fairly rare.  For example, in connection with the construction of the Southern Access Expansion  Pipeline  certificated  in  Docket  No. 06-0470,  fewer  than  a  dozen

37

condemnations were initiated as a "last resort" against landowners who would not meaningfully negotiate. Even in these circumstances, Enbridge continued to negotiate with the landowners and settled all such actions; none proceeded to a condemnation judgment. In this instance, due to Enbridge's rights in the Spearhead right-of-way, Enbridge anticipates that acquisition negotiations will be generally successful. (Application at 32-33)

Nonetheless, Enbridge states that as found in Docket No. 06-0470, Enbridge's experience as well as reality suggest that authority to condemn in proper circumstances, such as refusals to negotiate or refusals of contact, may be essential to avoid having the route that is most efficient and effective for all concerned – the environment, the public, the pipeline, and the landowners – blockaded by refusals to negotiate reasonably or at all. (Application at 33) Douglas Aller, the Land and Right-of-Way Manager, states that "experience and reality suggest that authority to condemn, in proper circumstances, may be essential to avoid having the route that is most efficient and effective for all concerned – the environment, the public, the pipeline, and the landowners – blockaded by a party seeking not just fair compensation, but to extract a windfall based on a strategic location and a refusal to negotiate reasonably or at all. Because so much of the FSP Project route is collocated with the Spearhead Pipeline, the potential for such behavior is enhanced due to the lessened feasibility of routing around a recalcitrant landowner." (Enbridge Ex. 2, at 14) It is self evident that due to having multiple-line rights in 70% of the Spearhead tracts on the route, sound pipeline practice dictates that the Flanagan South route be collocated with the Spearhead line to the maximum extent possible. But as explained by Doug Aller, this reality potentially enhances the monopoly power of a "holdout" landowner because Enbridge's ability to route around that landowner's property is considerably diminished by virtue of the significant benefits of using the existing right-of-way of the Spearhead Pipeline. (Application at 33) Enbridge maintains that under these circumstances, there cannot be serious question that a landowner, by virtue of a refusal to deal, could block or cause great difficulty and expense to the Flanagan South Pipeline Project if eminent domain authority were not granted. (Application at 33) Doug Aller stresses that "[a]lthough Enbridge's approach is always to acquire easements through genuine negotiations, the right to exercise condemnation authority is consistent with our duty as a common carrier to serve efficiently and without discrimination, which requires that the pipelines be constructed in the most cost-effective, environmentally preferable manner possible." (Enbridge Ex. 2, at 15) The grant of eminent domain authority will remove the incentive to holdout and engage in uneconomic rent-seeking and potentially diminish the monopoly power of a holdout landowner.

### B.    Staff's Position

In his direct testimony, Staff witness Mark Maple took the position that Applicant had not yet met the requirements for eminent domain authority set forth in Section 8-509 of the Act, because those requirements include that Enbridge must first obtain a certificate in good standing under Section 8-503 of the Act. (ICC Staff Ex. 1.0, at 25) As earlier discussed in this Order, in the same direct testimony Mr. Maple took the position that the Commission should "not at this time" grant a certificate in good

standing under Section 8-503 authorizing Enbridge to construct and operate the pipeline in question because, based on the information then before him, he was of the opinion that Enbridge had not proven that it is fit, willing, and able to safely construct and operate the pipeline. He also stated, however, that "[i]f the Company can prove that it meets these requirements, I would reconsider my position." (ICC Staff Ex. 1.0, at 29)

In his rebuttal testimony, as previously described, Mr. Maple changed his recommendation, after taking account of new information provided to him by Enbridge, and stated his belief that "subject to condition, Enbridge is fit, willing, and able to construct and operate the proposed pipeline." (ICC Staff Ex. 3.0, at 2)  Having thus determined that Enbridge FSP meets the requirements of Section 8-503 for a certificate in good standing, Mr. Maple also testified that "I am also recommending that the Commission grant Enbridge... the authority to exercise eminent domain if negotiations with landowners are unsuccessful." (ICC Staff Ex. 3, at 2)

C.    **Commission Analysis and Conclusion**

The Commission accepts and agrees with the conclusions and recommendations of the Staff, as discussed above and in Mr. Maple's testimony, with regard to the authorization under Section 8-509 of the Act for Applicant to enter upon, take, or damage private property under the law of eminent domain.  It is clear, and the Commission so concludes, that Enbridge has complied with the requirements of 83 Ill. Admin. Code Part 300 and is negotiating in good faith for the acquisition of necessary property interests, as is evident from both its declared policy to secure easements, etc. by negotiation and its willingness to pay at least fair-market values for such interests.

The Commission is also persuaded that a grant of eminent domain authority is warranted in this case because so much of the proposed pipeline is collocated with the Spearhead Pipeline, and this collocation makes the route most efficient and effective for all concerned.  As explained by Enbridge witness Doug Aller, this reality potentially enhances the monopoly power of a "holdout" landowner because Enbridge's ability to route around that landowner's property is considerably diminished by virtue of the significant benefits of using the existing right-of-way of the Spearhead Pipeline.  Under these circumstances, a landowner, by virtue of a refusal to deal, could block or cause great difficulty and expense to the Flanagan South Pipeline Project if eminent domain authority were not granted.

VIII.  **FINDINGS AND ORDERING PARAGRAPHS**

(1)    Enbridge Pipelines FSP, is a Delaware limited liability company authorized to conduct business in the State of Illinois;

(2)    the Commission has jurisdiction over the parties hereto and the subject matter hereof;

12-0347

(3)     the recitals of fact and conclusions reached in the prefatory portion of this
        Order are supported by the record and are hereby adopted as findings of
        fact;

(4)     within the meaning of Section 15-401(c) of the Common Carrier By
        Pipeline Law, the application was properly filed; a public need for the
        proposed service exists to the extent certificated herein; the Applicant is
        fit, willing, and able to provide service in compliance with this Act,
        Commission regulations, and orders; and the public convenience and
        necessity require issuance of a certificate in good standing to the extent
        approved herein; accordingly, a certificate in good standing authorizing
        Petitioner to operate as a common carrier by pipeline should be granted;

(5)     the Commission's grant to Enbridge FSP of a certificate in good standing
        is on the condition that Enbridge must implement all of the upgrades and
        changes which appear in Mr. Anderson's Rebuttal Testimony, Enbridge
        Ex. 7, as discussed in pages 18-20 of this order, and must do so before it
        begins operating the proposed pipeline;

(6)     the Commission's grant of a certificate in good standing to Enbridge FSP
        is also on the condition that Enbridge file a quarterly report with the
        Director of the Safety and Reliability Division of the Commission that gives
        the status of the pipeline construction project and also an update of
        Enbridge's response to ENG 1.74, giving the status of each action item.
        These quarterly reports are to continue until Enbridge has finished
        constructing the Illinois portion of the pipeline and has completed all of the
        action items on pages 15-17 of Mr. Anderson's Rebuttal Testimony,
        Enbridge Ex. 7;

(7)     the area to be covered by the certificate should consist of a 50-foot
        permanent pipeline right-of-way along the overall route of approximately
        168 miles generally identified in Attachments A-D to the Application in this
        proceeding; and up to 85-feet of temporary work space area running from
        the Flanagan terminal through parts of Livingston, Woodford, Tazewell,
        Mason, Fulton, Schuyler, Brown, and Adams Counties to the
        Illinois/Missouri border near Quincy, Illinois; and extra temporary
        workspace areas beyond the typical 85-feet in some locations, such as
        road, wetland, and water-body crossings;

(8)     in addition, the certificate should include Applicant's plans to add pumping
        capacity at its existing Spearhead pump stations at the Flanagan
        Terminal, at the Forest Pump Station in Mason County, and at the Quincy
        Station in Adams County. At the Forest and Quincy Stations, the
        certificate should also include approximately ten acres of additional space
        adjacent to each established site, to be acquired in fee;

40

12-0347

(9)     in reaching its conclusions in this proceeding, the Commission has considered all evidence presented including that enumerated in Section 15-401(b) of Common Carrier By Pipeline Law;

(10)    the authority to construct the proposed pipeline shall be subject to the conditions imposed in the prefatory portion of this order;

(11)    Petitioner shall comply with Section 15-401(c) of the Common Carrier by Pipeline Law;

(12)    Petitioner should be required to file, within 90 days from the entry of this Order, a Compliance Filing in this docket providing the legal description of the area covered by the certificate granted herein to reflect any revisions resulting from the findings and conditions in this Order and any revisions resulting from the negotiation process upon agreement among all parties affected by the revision;

(13)    the proposed pipeline is necessary and should be constructed, to promote the security or convenience of the public, pursuant to Section 8-503 of the Public Utilities Act;

(14)    any objections, motions, or petitions filed in this proceeding that remain unresolved should be deemed disposed of in a manner consistent with the ultimate conclusions contained in this Order.

IT IS THEREFORE ORDERED by the Illinois Commerce Commission that Enbridge Pipelines FSP, L.L.C. is hereby granted a Certificate in Good Standing pursuant to Section 15-401 of the Common Carrier By Pipeline Law to operate as a common carrier by pipeline and that said Certificate in Good Standing shall be the following:

### CERTIFICATE IN GOOD STANDING

IT IS HEREBY CERTIFIED, subject to the conditions imposed in this order, that Enbridge Pipelines FSP, L.L.C. is authorized, pursuant to Section 15-401 of the Common Carrier By Pipeline Law, to construct, operate and maintain the proposed 36-inch pipeline as described in this order and to operate as a common carrier by pipeline within an area sixty feet wide and extending approximately 168 miles along the route identified in Attachments A and B to the petition in Docket No. 12-0347.

IT IS FURTHER ORDERED that the proposed pipeline is necessary and should be constructed, to promote the security or convenience of the public, pursuant to Section 8-503 of the Public Utilities Act.

41

12-0347

IT IS FURTHER ORDERED that Petitioner's request under Section 8-509 of the PUA for authorization "to take or damage private property in the manner provided for by the law of eminent domain" is granted in this docket.

IT IS FURTHER ORDERED that Enbridge FSP is required to comply with Findings (5), (6), (10) and (11) above, and other conditions set forth in this Order.

IT IS FURTHER ORDERED that all petitions for leave to intervene are granted, to the extent not yet ruled upon, and that any other petitions, objections or motions filed in this proceeding that remain unresolved are hereby deemed disposed of in a manner consistent with the ultimate conclusions contained in this Order.

IT IS FURTHER ORDERED that subject to the provisions of Section 10-113 of the Act and 83 Ill. Adm. Code 200.880, this Order is final; it is not subject to the Administrative Review Law.

By order of the Commission this 14th day of February, 2013.


(SIGNED) DOUGLAS P. SCOTT


CHAIRMAN

42

# EXHIBIT B



LIVINGSTON COUNTY, ILLINOIS
SECTION 29, TOWNSHIP 28 NORTH, RANGE 4 EAST

TRACT IL-LV-0064.000

JEFF E. BARTH AND MICHELLE E. KNIGHT

FLANAGAN SOUTH PIPELINE
ENBRIDGE PIPELINES, L.L.C.
LIVINGSTON COUNTY, ILLINOIS

A Fifty (50) foot wide Permanent Easement being situated on and across the property of Jeff E. Barth and Michelle E. Knight, called the Southeast Quarter of the Northwest Quarter (SE/4 of NW/4) of Section 29, Township 28 North, Range 4 East, as described in Document number 00560738, as recorded in Deed Records of Livingston County, Illinois, said Permanent Easement, having a width of Twenty Five (25) feet either side of a baseline, being more particularly described by metes and bounds as follows:

Commencing at a found IDOT brass plaque marking the Northeast corner of said Section 29, Thence South 45° 36' 20'' West, a distance of 3,523.76 feet to a point on the Eastern line of said property, being the Point Of Beginning (POB) of herein described baseline of said Permanent Easement;

Thence South 54° 25' 44'' West, a distance of 628.85 feet to the Point Of Terminus (POT), of said baseline of Permanent Easement on the Southern line of said property, from which a found ½ inch iron pipe marking the Southeast corner of said property called the Center of said Section 29, having a Northing of 14515937.71 and an Easting of 2117293.26 bears North 86° 39' 48'' East, a distance of 529.39 feet, said Permanent Easement having a length of 628.85 feet or 38.11 rods, and containing 0.722 Acres.

Side lines of said Permanent Easement to be extended or shortened to intersect with the Eastern and Southern lines of said property.

Temporary Work Space

A Seventy (70) foot strip of land parallel, adjacent and contiguous to the Northern line of above described Permanent Easement, and a second Fifteen (15) foot strip of land parallel, adjacent and contiguous to the Southern line of said Permanent Easement, side lines of all Temporary Work Space to be extended and shortened to intersect with the Eastern and Southern lines of said property, having a total area of 1.42 Acres.

Bearings and distances in this description are Grid and based on UTM ZONE 15, NAD83 DATUM, US FOOT.

Craig Morse
Illinois Professional Land Surveyor No. 035-003710
*Westwood Professional Services, Inc.*

Sheet 2 of 2

# Exhibit B



**U.S. Department of Transportation**
**Pipeline and Hazardous Materials**
**Safety Administration**

| For the Public | Hazmat Safety Community | Pipeline Safety Community | Briefing Room |

Home

## DOT Fines Enbridge $2.4 million for Safety Violations

Aug 17, 2010



**U.S. Department of Transportation**
**Office of Public Affairs**
1200 New Jersey Ave., S.E.
Washington, D.C.
www.dot.gov/affairs/briefing.htm

**Home**

**About PHMSA**
- Mission and Goals
- About the Agency
- Key Officials
- Organization
- Calendar

**Promoting Safety & Security**
- Regulations
- Special Permits & Approvals
- International Standards
- Security
- Initiatives

**Encouraging Compliance**
- Training Resources
- Outreach
- Inspections & Enforcement
- Drug & Alcohol Testing

**Supporting Community Response**
- Preparedness & Response
- State Programs & Grants
- Incident Reporting

**PHMSA Resources**
- Data & Statistics
- eForms
- ePayments
- Glossary
- Library

PHMSA 03-10
Tuesday, August 17, 2010
Contact: Julia Piscitelli
Tel: (202) 366-4831

**DOT FINES ENBRIDGE $2.4 MILLION FOR SAFETY VIOLATIONS**
*Department requires company to revise safety procedures, properly train workers*

The U.S. Department of Transportation today announced more than $2.4 million in fines against Enbridge Energy Partners, LP for violations of federal pipeline safety regulations. On Nov. 28, 2007, two Enbridge employees were killed when repairs to an Enbridge pipeline on their Lakehead system in Clearbrook, Minn. caused leaking crude oil to ignite.

An extensive accident investigation conducted by the Pipeline and Hazardous Materials Safety Administration (PHMSA) found Enbridge failed to safely and adequately perform maintenance and repair activities, clear the designated work area from possible sources of ignition, and hire properly trained and qualified workers. PHMSA's year-long investigation led to issuance of a notice of proposed violation to Enbridge and a subsequent hearing, prior to this final order.

"Safety is the number one priority of this Department," said U.S. Transportation Secretary Ray LaHood. "This Department holds pipeline operators accountable for protecting their own workers as well as the health, welfare and safety of American communities where they operate."

A final order issued today by PHMSA details the violations of federal pipeline safety regulations and imposes the $2,405,000 civil penalty. Enbridge also must revise and implement certain pipeline maintenance and repair procedures, as well as train and requalify its employees.

Civil penalties associated with a final order must be paid within 20 days unless the operator chooses to file a petition requesting that PHMSA reconsider its findings. PHMSA may grant or deny the operator's request without further proceedings.

PHMSA is also issuing two additional final orders to Enbridge today totaling $57,800 in civil penalties for violations identified following inspections at facilities in Houma, La. in 2006 and Cushing, Okla. in 2009. During inspections in Houma, PHMSA discovered failures by Enbridge Offshore Gas Gathering, LLC, to properly monitor for internal corrosion and perform valve maintenance procedures resulting in a civil penalty of $29,000. Inspections at the company's Cushing Terminal facility resulted in a civil penalty of $28,800 for failing to properly inspect in-service breakout tanks.

Enbridge Energy Partners, LP owns and operates liquid petroleum and natural gas



Exhibit C

Systems Integrity   Case Studies   Marshall Spill Case Study

## Overview of Marshall Spill

On July 26, 2010, a crude oil spill on Line 6B of the Enbridge Energy Partners (EEP) Lakehead system was reported near Marshall, Michigan. Enbridge estimates that 20,000 barrels of crude oil were leaked at the site and that, of that amount, about 8,000 barrels reached the Talmadge Creek, a tributary of the Kalamazoo River.

The released crude oil affected about 61 kilometres (38 miles) of area along the Talmadge Creek and Kalamazoo River waterways between Marshall and downstream of Battle Creek, Michigan.

A multi-agency effort led by the U.S. Environmental Protection Agency (EPA), the Michigan Department of Natural Resources and Environment (MDNRE), and other federal, state and local agencies guided the cleanup and remediation efforts. By spring 2011, 18,245 barrels of the oil had been recovered and re-injected into Enbridge's terminal in Griffith, Indiana.

Prior to the leak, Enbridge had been transporting about 190,000 barrels of crude oil per day on Line 6B. Enbridge completed the removal and replacement of the pipeline segment that failed under the supervision of the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA), which required us to perform specific tasks to ensure the safety of the pipeline before returning it to service. We completed these steps, and safely returned the pipeline to service on September 27, 2010.

As part of the Corrective Action Order on Line 6B, PHMSA directed Enbridge to replace a section of the pipeline located beneath the St. Clair River, which forms the border between Michigan and Ontario. A dent in that section had been confirmed during a 2009 in-line inspection. The dent had most likely been present since the pipe's installation in the late 1960s, however, following the Marshall leak, public tolerance for any risk on Enbridge's system was understandably low and scrutiny of Enbridge by elected and regulatory officials was high. Therefore, with operational excellence in mind, Enbridge completed the repair in June 2011, well before the September 2011 PHMSA deadline.

During the second quarter of 2012, cleanup of the areas affected by the Line 6B release had been substantially completed, which allowed the Kalamazoo River and Morrow Lake to be re-opened for recreational use. Enbridge will also continue to perform necessary remediation, restoration and monitoring of the areas affected by the Line 6B crude oil release.

Enbridge initially estimated $430 million of aggregate gross costs resulting from our response efforts, before insurance recoveries, fines and penalties, and about $13 million of lost revenue. Those costs included the emergency response, environmental remediation and cleanup activities

associated with the crude oil release and potential claims by third parties.

We revised our estimate to $550 million based on a review of costs and commitments incurred, as well as additional information concerning the requirements for environmental restoration and remediation. That number represented the gross estimate before insurance recoveries. Enbridge had expected to pay about 90 per cent of the estimated costs by the end of 2011.

However, on July 2, 2012, Enbridge received a Notice of Probable Violation (NOPV) from PHMSA related to the Line 6B crude oil release, which indicated a US$3.7 million civil penalty. Enbridge agreed to pay the penalty and included that amount in the total estimated cost for the Line 6B crude oil release. As a result of this fine and some additional work that was required, Enbridge, as of June 30, 2012, revised the total estimate for costs to US$785 million ($131 million after-tax attributable to Enbridge) for this incident, before insurance recoveries, and excluding fines and penalties which may be imposed by federal, state and local government agencies, other than the PHMSA civil penalty described above.

The expected losses associated with the Line 6B crude oil release include those costs that are considered probable and that could be reasonably estimated at June 30, 2012. Despite the efforts Enbridge has made to ensure the reasonableness of our estimates, there continues to be the potential for us to incur additional costs in connection with the Marshall spill due to variations in any or all of the cost categories, including modified or revised requirements from regulatory agencies, in addition to fines and penalties and expenditures associated with litigation and settlement of claims.

On July 10, 2012, the U.S. National Transportation Safety Board (NTSB) presented the results of its investigation into the Line 6B crude oil release and subsequently posted its final report on July 26, 2012.

Responding to community needs

Taking care of the communities is a vital part of Enbridge's ongoing response to the leak on its Line 6B in Michigan.

Enbridge opened community centres in Marshall and Battle Creek within days following the incident to provide a way for the public to ask questions about the spill or to submit claims for damages. In general, the claims issues ranged from property impacts to expenses incurred as a direct result of the leak to medical issues.

Enbridge also initiated a home purchase program for people living within 61 metres (200 feet) of Talmadge Creek and the Kalamazoo River. The program was designed to help maintain property values to help minimize any immediate adverse reactions to the housing market because of the spill. By the time the program ended in July 2011, the company had purchased over 150 homes. A toll-free information hotline was established immediately following the incident. Issues addressed in the calls ranged from questions about air and water quality to reporting locations of oiled wildlife. In conjunction with U.S. Fish and Wildlife, a Wildlife Response Center was established in Marshall and began taking in animals within a few days following the spill. Several types of oiled wildlife, including ducks, geese, beavers and turtles were treated at the centre, and most were released back into their natural habitat.

By spring 2012, cleanup, under the direction of the U.S. Environmental Protection Agency, hadprogressed to the point that the Kalamazoo River and Morrow Lake had been reopened for recreational use.

Based on input from local residents, community leaders and recreation groups, much of our community efforts have focused on increasing access to the Kalamazoo River. Enbridge has created or improved five river access sites to encourage recreational opportunities along the Kalamazoo River.

Three new locations were dedicated in the fall of 2011. They are called Saylor's Landing, Angler's Bend and Paddler's Grove. In June 2012, Calhoun Countyreopened Historic Bridge Park to the community where Enbridge added parking, enhanced theplayground and picnic area, and added a handicap-accessible boat lift. Enbridge is alsoestablishing a portage route around Ceresco Dam to provide a safe and legal way for people tonavigate around the dam.

A high priority for Enbridge is to ensure that local communities along the river support these investments. Enbridge is in the process of engaging regulators, elected officials, public representatives and interested parties regarding Enbridge's community investment programs to ensure there is broad public participation and support.

In addition, Enbridge has and will continue to support other programs that align with our corporate community investment initiatives to help build sustainable communities. Enbridge has contributed more than $300,000 to organizations in the area, including the Marshall Historical Society; Wilder Creek Conservation Club; United Ways of Battle Creek, Marshall and Kalamazoo; Red Cross of South Central Michigan; Food Bank of South Central Michigan; Michigan Envirothon.

Other ways for Enbridge to support the local communities have emerged as well. Enbridge provided use of our helicopter normally used for daily air operations to local law enforcement in search operations on two occasions: once for a bank robber and another for a woman who had gone missing from an adult foster care home. Local emergency services and personnel from the National Weather Service also used the helicopter following a severe storm that swept through Battle Creek in June 2011 in order to view the damage from the air. Also, Enbridge provided the sonar equipment used in the cleanup efforts for the search and recovery effort when a young man drowned in the Kalamazoo River this spring.

Enbridge employees have also made personal contributions to the Marshall and Battle Creek communities. They contributed more than $3,500 to a United Way campaign and more than $1,400 for the Red Cross following the Battle Creek storms.

Enbridge's Line 6B spill was unprecedented for our company. We committed since the outset of the incident to restore the area as closely as possible to its pre-existing condition, and to the satisfaction of the U.S. EPA, Michigan Department of Environmental Quality and the local community. We remain fully committed to that goal.

For current information on our response to the Marshall spill, please visit our **Line 6B Response website (http://response.enbridgeus.com/response/default.aspx)**.

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| MICHELLE KNIGHT and JEFFERY BARTH, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ENBRIDGE PIPELINES (FSP) L.L.C. and | ) |
| CCPS TRANSPORTATION, L.L.C., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| ———————————————————— | ) Case No. 12-CV-01244 |
| | ) |
| ENBRIDGE PIPELINES (FSP) L.L.C. and | ) |
| CCPS TRANSPORTATION, L.L.C., | ) |
| | ) |
| Counterclaimants, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHELLE KNIGHT and | ) |
| JEFFERY BARTH, | ) |
| | ) |
| Counterdefendants. | ) |

**<u>PROOF OF SERVICE</u>**

I, the undersigned, hereby certify that I served a copy of the foregoing document by placing a copy of same in an envelope addressed and with postage prepaid; depositing said envelope in the United States Post Office at Bloomington, Illinois, at or about 5:00 p.m. on August 22, 2013.  Said copies were mailed to the following parties of record:

Gerald. A. Ambrose
John A. Heller
Angela M. Weis
SIDLEY AUSTIN  LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Thomas A. McConnaughay
Christopher J. Spanos
WESTERVELT, JOHNSON, NICOLL & KELLER,  LLC
411 Hamilton Boulevard
Peoria, Illinois 61602
(309) 671-3550

OF COUNSEL:

Joel W. Kanvik
Director, U.S. Law & Assistant Secretary
Enbridge Energy Company, Inc.
26 E. Superior s-. Ste. 309
Duluth, Minnesota 55802
(218) 464-5600

                    /s/ Mercer Turner
                    _____
                    Mercer Turner


Mercer Turner
Law Office of Mercer Turner, P.C.
202 N. Prospect Road, Suite 202
Bloomington, IL 61704
(309) 662-3078